## In re SURFACE MINING REGULATION LITIGATION.

Civ. A. No. 78–162.

United States District Court,
District of Columbia.

May 3, 1978.

Lois J. Schiffer, Alfred T. Ghiorzi, David C. Cannon, Jr., Carol Green, Michael A. McCord, Land & Natural Resources Div., Gen. Litigation Section, U. S. Dept. of Justice, Washington, D. C., for defendants.

Frank B. Friedman, Edgar H. Twine, Washington, D. C., for plaintiff Atlantic Richfield Co.

Warner W. Gardner, I. Michael Greenberger, Shea & Gardner, Washington, D. C., for plaintiff Peabody Coal Co.

Richard McMillian, Jr., John A. Macleod, Washington, D. C., for plaintiffs Amherst Coal Company, et al. and Consolidation Coal Co.

Francis J. McShalley, McGee & Ketcham, Washington, D. C., Thomas G. Johnson, S. S. Dur, Houston, Tex., for plaintiff R & F Coal Co.

John L. Hill, Atty. Gen. of Texas, P. M. Schenkkan, Sp. Asst. Atty., Austin, Tex., for plaintiff State of Texas.

Edward H. Forgotson, Nicholas S. Reynolds, Washington, D. C., Spencer C. Relyea, Dallas, Tex., for plaintiff Texas Utilities Generating Co.

Peter J. Nickles, Eugene D. Gulland, Washington, D. C., for plaintiff Sunoco Energy Development Co., et al.

Roberts B. Owen, Robert N. Sayler, Theodore Voorhees, Jr., Robert J. Gage, Washington, D. C., Thomas L. Wylie, Senior Counsel, William L. Hynan, Senior Vice President, National Coal Association, Washington, D. C., for plaintiff National Coal Association.

Guy Nevill, Houston, Tex., Michael Henke, Vinson & Elkins, Washington, D. C., for plaintiff Dow Chemical Co.

Stuart T. Saunders, Jr., Rose, Schmidt, Dixon, Hasley & Whyte, Washington, D. C., for plaintiff Western Pennsylvania Surface Coal Mine Operators Association, et al.

W. Stanfield Johnson, Washington, D. C., for plaintiff Consolidation Coal Co., et al.

Charles F. Cook, Vice President, Edward M. Green, Senior Counsel, American Mining Congress, Washington, D. C., Anthony J. Thompson, Edward A. McCabe, Charles E. Sliter, Hamel, Park, McCabe & Saunders, Washington, D. C., for plaintiff American Mining Congress, et al.

John L. Kilcullen, Michael T. Heenan, Washington, D. C., for plaintiff Utah International Inc.

J. Thomas Steger, Asst. Atty. Gen., Marshall Coleman, Atty. Gen., Richmond, Va., for plaintiff State of Virginia.

Steven L. Friedman, John M. Elliott, Dilworth, Paxson, Kalish, Levy & Kauffman, Philadelphia, Pa., Stuart P. Ross, Roger Trangsrud, Patrick M. Raher, Hogan & Hartson, Washington, D. C., for plaintiff Pennsylvania Coal Mining Association, et al.

Robert J. Golten, National Wildlife Federation, Washington, D. C., Charles Hill, Terence Thatcher, Institute for Public Interest, Washington, D. C., Thomas Galloway, Center for Law and Social Policy, Washington, D. C., for plaintiff, defendant-intervenor National Wildlife Federation, et al.

Chauncey H. Browning, Jr., Atty. Gen., Dennis Abrams, Asst. Atty. Gen., Charleston, W. Va., for plaintiff State of West Virginia.

William I. Althen, Robert J. Coyne, Washington, D. C., for plaintiff Virginia Surface Mining & Reclamation Association, Inc., et al.

## MEMORANDUM OPINION AND ORDER

FLANNERY, District Judge.

### I. Introduction

This matter comes before the court on plaintiffs' motions for summary judgment and for a preliminary injunction. This action involves twenty-two consolidated cases attacking regulations promulgated by the Secretary of Interior pursuant to the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. § 1201 et seq., which was enacted on August 3, 1977.

The Act establishes a two-tier regulatory program to protect the environment from the damaging effects of surface coal mining. The two-tiers include an interim program, that is presently before the court, and a permanent program which will be implemented over the next two years. Section 501(a) of the Act requires the Secretary to promulgate within 90 days of enactment regulations establishing the interim regulatory program. The interim regulations were promulgated on December 13, 1977 [1] and they include standards for, inter alia, spoil and waste disposal, reclamation operations, the use of explosives and impoundments, topsoil protection, hydrology system protection, and revegetation. See 42 Fed.Reg. 62639 (Dec. 13, 1977). New surface coal mining operations commencing on or after February 3, 1978 must comply with the performance standards of the interim regulations when the operations begin. All surface mining operations which commenced prior to February 3, 1978, with certain exceptions, must comply with the performance standards of the interim program by May 3, 1978.

---

1. Two subsections of the regulations, § 710.-11(d)(2) and (3), were amended in February of 1978. See 43 Fed.Reg. 5001 (Feb. 7, 1978) (§ 710.11(d)(2)); 43 Fed.Reg. 8091 (Feb. 27, 1978) (§ 710.11(d)(3)). Interim regulations for Indian lands were published on December 16, 1977. See 42 Fed.Reg. 63394.

Certain plaintiffs seek a preliminary injunction to enjoin the implementation and enforcement of certain regulations that they contend will cause irreparable injury to them if the regulations become operative on May 3, 1978. These plaintiffs assert that the provisions should not be allowed to become effective until the court has the opportunity to perform a full substantive review pursuant to the standards of section 526(a)(1). Other plaintiffs have asked the court to grant summary judgment to them on attacks to regulations that they claim the court can determine to be arbitrary, capricious or inconsistent with law under § 525(a)(1) at this stage of the proceedings. Generally, the industry plaintiffs[2] have joined in each others' motions. The environmental groups that are plaintiffs have moved for summary judgment on their challenge to two subsections of the regulations. The federal defendants[3] contend that all of the issues can be resolved as motions for summary judgment because the judicial review involved is a review of the merits of the administrative record which is before the court.[4] The federal defendants believe that the need for a preliminary injunction will arise only if the court is unable to decide the merits prior to May 4, 1978. The federal defendants have not made any motions for summary adjudication and they only ask that this court deny plaintiffs' motions for summary judgment and a preliminary injunction.

## II. *Industry Plaintiffs' Motions*

The industry plaintiffs' motions will be dealt with first. Their attack involves both procedural challenges concerning the manner of promulgation of the regulations and substantive challenges to the regulations themselves. The substantive challenges include: (1) that five matters to be regulated in the permanent program are improperly regulated in the interim program; (2) that adequate exemption and variance procedures are lacking throughout the interim regulations; (3) that the regulations improperly extend to pre-existing structures and facilities; (4) that prime farmlands standards have been improperly extended to non-prime farmland areas; (5) that the prime farmlands statutory grandfather exemption has been improperly narrowed; (6) that waste impoundment has been improperly regulated; (7) that the regulations improperly limit blasting; (8) that the regulations improperly limit the discharge of manganese into alkaline surface water; and (9) that the regulations improperly implement the small operators exemption.[5] The procedural challenges allege: (1) that the Secretary failed to consider the effects of the regulations on the economy, inflation, and the nation's coal supply; and (2) that the

2. Plaintiffs in the twenty-two cases include coal mine operators, trade associations, three states, and environmental groups. The term "industry plaintiffs" shall be used in reference to all of the plaintiffs except the environmental groups and the states.

3. The term "federal defendants" shall be used in reference to all of the defendants except the environmental groups who appear as defendant-intervenors in opposition to the industry plaintiffs' motions, in addition to appearing as plaintiffs in the consolidated action.

4. In its order of April 18, 1978 this court held that pursuant to section 526(a)(1) and 526(b) of the Act, this court's review of the regulations in question is limited to the administrative record made "before the Secretary". This limitation, however, only applies to this court's substantive review of the regulations on their merits. Because the court will be unable to review all of the issues presented by the motions on the merits prior to May 4, 1978, the affidavits filed

by the plaintiffs in support of their motions for a preliminary injunction will be considered on the question of equitable relief.

5. The industry plaintiffs also originally asserted that the regulations improperly failed to provide for federal-state regulatory coordination. This attack was directed at the ability of the states, as the "regulatory authority" referred to in the regulations, to act on plaintiffs' requests for approval of variances and procedures as provided for by the regulations. In response to this attack, the federal defendants provided affidavits from officials in 12 of the 14 states that the plaintiffs were concerned about indicating that the states intended to act on plaintiffs' requests before May 4, 1978. In their Joint Reply Brief (I) plaintiffs withdrew their motion for a preliminary injunction on this issue "until such time as plaintiffs after May 4 should move to bring it up for decision."

basis and purpose statement accompanying the regulations is inadequate.[6] Plaintiffs' procedural challenges will be considered first.

## A. *Plaintiffs' Procedural Challenges*

█ One of plaintiffs' assertions is that the basis and purpose statement accompanying the interim regulations is inadequate. The basis and purpose statement precedes the regulations in the Federal Register. 42 Fed.Reg. 62639–62675 (Dec. 13, 1977). The federal defendants also note that two sections of the regulations, § 700.2 and § 710.2, outline the objectives of the regulations. Furthermore, the defendants assert that the certified index to the administrative record filed in this action on March 20, 1978 serves to remedy any inadequacies of the statement in identifying the bases of the regulations.

The basis and purpose statement published with the regulations (1) is an adequate statement of "and why the regulations were actually adopted", *Amoco Oil v. EPA*, 163 U.S.App.D.C. 162, 179, 501 F.2d 722, 739 (1974); (2) sets forth "a thorough and comprehensible statement of the reasons" for the agency's decisions, *National Nutritional Foods Ass'n v. Weinberger*, 512 F.2d 688, 701 (2d Cir. 1974); (3) explains the agency's policy choices and standards, *Environmental Defense Fund v. EPA*, 150 U.S.App.D.C. 348, 359, 465 F.2d 528, 539 (1972) and (4) explains the agency's resolution of "significant problems raised by the comments," *Rodway v. United States Department of Agriculture*, 168 U.S.App.D.C. 387, 395, 514

F.2d 809, 817 (1975). Given the statutory time constraints, the basis and purpose statement sufficiently details the Secretary's actions and how the comments were considered and the problems resolved. *See Kennecott Copper Corp. v. EPA*, 149 U.S. App.D.C. 231, 234–35, 462 F.2d 846, 849–50 (1972). To the extent that the statement lacks citations to the technical data supporting the regulations, this deficiency was properly remedied by the certified index to the administrative record filed on March 20, 1978. *Portland Cement Association v. Ruckelshaus*, 158 U.S.App.D.C. 308, 327, 486 F.2d 375, 394 (1973), *cert. denied*, 417 U.S. 921, 94 S.Ct. 2682, 41 L.Ed.2d 226 (1974). The certified index adequately identifies the technical literature relied upon by the Secretary in support of the regulations. In their Joint Reply Brief (II) the plaintiffs generally attack the adequacy of the data cited in support of the regulations. This court is of the opinion that these objections can be more fully considered during this court's substantive review of the specific regulations, rather than through broad assertions at this stage of the litigation.

█ The plaintiffs' second procedural challenge concerns the Secretary's alleged failure to consider the effect of the regulations on the economy, inflation, and the nation's coal supply. Plaintiffs assert that the Secretary's failure to issue an economic impact statement with the regulations violated § 102(f) of the Act (30 U.S.C. § 1202(f)), Executive Order 11821, an Office of Management and Budget (OMB) circular, and the Department of Interior's own regu-

**6.** In their Joint Reply Brief (II) plaintiffs also assert, for the first time, that the comment and hearing proceedings concerning the interim regulations were inadequate because the agency did not identify the technical literature it was relying upon, with one exception. Thus, the plaintiffs contend that full public participation was denied and effective comment on the proposed regulations was impossible. The federal defendants respond that the material involved was technical literature already in the public domain. Furthermore, as the federal defendants indicated in earlier motions concerning the administrative record, they were operating under severe statutory time constraints and the record was not organized until

after the regulations were promulgated in December of 1977. In its opinion of April 18, 1978, this court noted that the United States Court of Appeals for the District of Columbia Circuit has held that disclosure of information subsequent to the issuance of a rule is acceptable when the agency is operating under statutory time constraints. *Portland Cement Association v. Ruckelshaus*, 158 U.S.App.D.C. 308, 327, 486 F.2d 375, 394 (1973), *cert. denied*, 417 U.S. 921, 94 S.Ct. 2682, 41 L.Ed.2d 226 (1974). Thus the agency's disclosure of technical literature was adequate in this case and full public participation was provided in the comment and hearing procedures.

lations. First, section 102(f) of the Act does not require an economic impact statement.[7] Second, a private civil action is not available for enforcement of Executive Order 11821. *Independent Meat Packers Ass'n v. Butz*, 526 F.2d 228, 234–36 (8th Cir. 1975) *cert. denied*, 424 U.S. 966, 96 S.Ct. 1461, 47 L.Ed.2d 733 (1976); *see Stevens v. Carey*, 483 F.2d 188, 190 (7th Cir. 1973) (Executive Order 10988); *Farkas v. Texas Instrument, Inc.*, 375 F.2d 629, 632–33 (5th Cir.), *cert. denied*, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 471 (1967) (Executive Order 10925); *Manhattan-Bronx Postal Union v. Gronouski*, 121 U.S.App.D.C. 321, 350 F.2d 451, 456 (1965), *cert. denied*, 382 U.S. 978, 86 S.Ct. 548, 15 L.Ed.2d 469 (1966) (Executive Order 10988). Third, the Secretary's decision not to prepare an economic impact statement for the interim regulations was reasonable and not in violation of the OMB circular and the Department's internal rules. The Secretary's actions in determining that the interim regulations did not constitute a "major proposal" so as to require an economic impact statement and relying on the Library of Congress and Congressional Budget Office studies were not arbitrary, capricious or inconsistent with law. This court is of the opinion that the Secretary gave due consideration to the effects the interim regulations would have on the economy, inflation, and the nation's energy supply as is evidenced by the basis and purpose statement and the administrative record. Therefore, plaintiffs' motions concerning procedural challenges will be denied.[8]

## B. *Plaintiffs' Substantive Attacks*

### (1) *Interim v. Permanent Regulations*

In challenging specific provisions of the regulations plaintiffs first assert that five provisions to be included in the permanent program were improperly implemented in the interim program. The plaintiffs assert that the Secretary improperly included regulations concerning the surface effects of underground mining, prime farmlands, spoil disposal, waste, and alluvial valley floors in the interim program.

Section 501(a) of the Act requires that within 90 days of enactment the Secretary publish regulations "covering an interim regulatory procedure for surface coal mining and reclamation operations setting mining and reclamation performance standards based on and incorporating the provisions set out in section 502(c) of this Act." 30 U.S.C. § 1251(a). Section 502(c) specifically incorporates into the interim program eight subsections of section 515—515(b)(2), (3), (5), (10), (13), (15), (19), and 515(d). The plaintiffs argue that the eight general performance standards selected from the 25 standards set forth in § 515 to be included in the interim program exclusively limit the scope of the program. The defendants contend that Congress did not intend to exclude all of the other standards from the interim regulations. The defendants assert that in order to meet the goals and objectives of the interim program and provide the protection required in the interim program certain other standards included in the permanent program were necessarily adopted in the interim regulations. The five areas challenged by the plaintiffs will be discussed individually.

### (a) *Surface Effects of Underground Mining*

Plaintiffs contend that the provisions regulating the surface effects of underground mining in the interim program are invalid because: 1) the language and the legislative history of the Act indicate that § 516 is the exclusive source for the regula-

---

7. Section 102(f) merely states that one of the purposes of the Act is to "assure that the coal supply essential to the Nation's energy requirements, and to its economic and social well-being is provided . . . ." 30 U.S.C. § 1202(f).

8. Certain plaintiffs also challenged provisions of the regulations on the ground that they vio-

lated the command of § 501(a) that the interim regulations "shall be concise and written in plain, understandable language." Given the technical nature of the regulations challenged and the matters covered by the provisions, the Secretary has, to the extent possible, complied with this requirement.

tion of underground mining and it was not to be implemented in the interim program; and 2) the Secretary did not obtain the necessary concurrence of the head of the Mine Enforcement and Safety Administration (MESA) before promulgating the regulations. Section 516 of the Act directs the Secretary to promulgate regulations concerning the surface effects of underground mining. None of the provisions of § 516 are incorporated into the interim program by § 502(c).

The defendants contend, however, that the surface effects of underground mining can be regulated pursuant to sections 502(c) and 515. Section 502(c) makes the interim regulations applicable to "all surface coal mining operations." Section 701(28) defines surface coal mining operations to include "activities conducted on the surface of lands in connection with a surface coal mine or subject to the requirements of section 516 surface operations and surface impacts incident to an underground coal mine . . . ." 30 U.S.C. § 1291(28). Thus, the defendants rely on the definitional section to reach the surface impacts incident to underground mines in the interim regulations.[9] The defendants also cite the legislative history of the Act to illustrate Congress' intent to have the surface effects of underground mining regulated in the interim program. S.Rep. No. 95–128, 95th Cong., 1st Sess. 71 (1977); 123 Cong.Rec. S12443 (daily ed. July 20, 1977) (remarks of Senator Metcalf).[10] This court is of the opinion that the Secretary's promulgation of six limited provisions regulating the sur-

face effects of underground mining in the interim program was not arbitrary, capricious or inconsistent with law.

The plaintiffs also assert that the regulations concerning the surface effects of underground mines are invalid because the Secretary failed to obtain the concurrence of the head of the Mine Enforcement & Safety Administration prior to promulgation. Section 516(a) of the Act states that rules directed toward the surface effects of underground mining:

> [S]hall not conflict with nor supersede any provision of the Federal Coal Mine Health and Safety Act of 1969 nor any regulation issued pursuant thereto, and shall not be promulgated until the Secretary has obtained the written concurrence of the head of the department which administers such Act.

On the date the regulations were promulgated, December 13, 1977, the MESA, which administers the Coal Mine Health and Safety Act of 1969, was part of the Department of the Interior. The defendants argue that the "head of the department" was the Secretary of the Interior, the person who promulgated the regulations. Thus, the defendants contend that the concurrence of the Secretary in regulations he was promulgating was unnecessary.

The defendants note that in March, 1978 responsibility for enforcement of the Coal Mine Health and Safety Act was transferred to the Department of Labor. They assert that because the move was foreseen

---

**9.** The Secretary can also rely on the command of § 516(b)(10) that the operator "operate in accordance with the standards established under section 515" for surface effects not specified in § 516(b) to support sections 717.12, 717.14, and 717.15 of the regulations.

**10.** In support of their interpretation of the Act, the plaintiffs rely on statements made subsequent to enactment by individual senators as "legislative history." The plaintiffs cite statements made by members of the Senate Committee on Energy and Natural Resources during the hearings on the confirmation of Mr. Heine as Director of the Office of Surface Mining Reclamation and Enforcement. *See* Hearing before the Committee on Energy & Natural

Resources, United States Senate, on the Nomination of Walter N. Heine to be Director of the Office of Surface Mining Reclamation & Enforcement, 95th Cong., 1st Sess., at 10, 19–20 (1977). Although these statements were made by members of the committee that reported the bill that evolved into the Act, statements made after passage, not in reference to amendments to the Act, are not persuasive legislative history. *See, e. g., Manhart v. Los Angeles Dep't of Water & Power,* 553 F.2d 581, 589 (9th Cir. 1977); *N. C. Freed Co. v. Board of Governors of the Federal Reserve System,* 473 F.2d 1210, 1217 n. 23 (2d Cir. 1973); *Texas Medical Ass'n v. Mathews,* 408 F.Supp. 303, 313 (W.D.Tex. 1976).

at the time of enactment of the Surface Mining Control and Reclamation Act, the requirement was not meaningless. Thus, the concurrence of the Secretary of Labor will be required when regulations covering the surface effects of underground mines are promulgated pursuant to § 516 in the permanent program.[11]

 Although interpreting the Act to require the Secretary to concur in his own regulations does not appear totally satisfactory, the result suggested by the plaintiffs would not be more meaningful. Plaintiffs would require that the Secretary have obtained the concurrence of the Administrator of MESA, a subordinate of the Secretary. Obtaining the necessary concurrence would have been only a formality. This court is of the opinion that the Secretary did not have to obtain the concurrence of the Administrator of MESA and that § 516(a) only requires that the Secretary obtain the concurrence of the Secretary of Labor before the permanent regulations are promulgated. Therefore, plaintiffs' motions as to the regulations concerning the surface effects of underground mines will be denied.

(b) *Prime Farmlands*

 The plaintiffs' attack on the Secretary's promulgation of regulations covering mining on prime farmlands also is based on the absence of a citation to the prime farmlands provisions, §§ 510(d) and 515(b)(7), in § 502(c). In promulgating the prime farmlands regulations, the Secretary relied on § 510(d). 42 Fed.Reg. 62661 (Dec. 13, 1977). Section 510(d), a prime farmlands provision, states that, "Except for compliance with

subsection (b), the requirements of this paragraph (1) shall apply to all permits issued after the date of enactment of this Act." Thus, the Secretary contends that Congress made the prime farmlands performance standards effective immediately upon enactment.[12] The Secretary's interpretation appears to be reasonable and not arbitrary, capricious or inconsistent with law.[13]

The plaintiffs argue that the statutory definition of the word "permit," *see* § 701(15), makes § 510(d) only applicable to the permanent program. The plaintiffs' interpretation must be rejected because: 1) the term "permit" is used in the Act in reference to permits other than those issued pursuant to the permanent regulatory program, *see* §§ 502(a), 510(d)(2); and 2) plaintiffs' construction would render the use of the phrase "date of enactment" in sections 510(d)(1) and (2) meaningless. Although the statutory provision is not ambiguous so as to require resort to legislative history, it also should be noted that the legislative history supports the defendants' interpretation. *See* S.Rep. No. 95–337, 95th Cong., 1st Sess. 105 (1977) (Conference Report). Therefore, plaintiffs' motions concerning the prime farmlands provisions of the regulations will be denied.

(c) *Spoil Disposal*

The Secretary properly included regulations covering the disposal of spoil in the interim program. Although § 515(b)(22) which covers spoil disposal in the permanent program, was not one of the sections placed in the program via § 502(c), spoil disposal has been properly regulated in the

---

11. It also should be noted that because the provisions of § 516 will only be implemented in the permanent program, even though the surface effects of underground mining are being regulated via § 515 in the interim program, the statute was only concerned with obtaining written concurrence after MESA was to be transferred to the Department of Labor.

12. Other provisions of the Act also became effective immediately upon enactment. *See, e. g.,* §§ 521(a)(2), 522(e).

13. Texas Utilities Generating Company's argument that the prime farmlands provisions in the interim regulations are in effect the permanent regulations under § 501(b) and, therefore, must comply with the National Environmental Policy Act, is without merit. The only regulations before the court are regulations in the interim program and § 501(a) of the Act provides that "The issuance of the interim regulations shall be deemed not to be a major Federal action within the meaning of section 102(2)(c) of the National Environmental Police Act of 1969 (42 U.S.C. 4332)."

interim program in order to meet the objectives of sections 515(b)(3) and (10) which are included in the interim program by § 502(c). *See* 42 Fed.Reg. 62646 (Dec. 13, 1977). Section 515(b)(3) establishes spoil and waste handling requirements for surface coal mining operations and section 515(b)(10) provides for the protection of the hydrologic balance.

▪ The Secretary reasonably concluded that regulation of spoil disposal was necessary to preserve the hydrologic balance and prevent water pollution as required by § 515(b)(10) and to control the restoration of land to its approximate original contour and prevent land erosion as required by § 515(b)(3).[14] Even though spoil disposal will be specifically regulated by § 515(b)(22) in the permanent program, the limited regulation of this matter in the interim program to meet the objectives of other provisions was entirely proper and not arbitrary, capricious or inconsistent with law. This overlap, whereby provisions of the permanent regulations are included in the interim regulations in order to fully implement the interim program, was contemplated by Congress. 123 Cong.Rec. S12442–443 (daily ed. July 20, 1977) (remarks of Senators Metcalf and Metzenbaum). Therefore, plaintiffs' motions concerning the spoil disposal regulations will be denied.

#### (d) *Waste*

▪ The regulations covering waste disposal were properly included in the interim program. Again the Secretary relies on the mandate of § 515(b)(10), incorporated into the interim program by § 502(c), that the hydrologic balance be preserved. *See* 42 Fed.Reg. 62646 (Dec. 13, 1977). As the defendants contend, "the primary purpose and effect of each of these provisions are the

protection of ground and surface water by treatment of the waste and spoils whose runoffs could adversely affect the water quality." Although these areas will be more extensively covered in the permanent regulations pursuant to sections 515(b)(11) and (14), the Secretary was empowered to implement these regulations to prevent water pollution pursuant to § 515(b)(10)(A) and (G). These regulations are necessary to avoid water pollution from waste materials that would prevent the hydrologic balance being maintained in the interim program.[15] Because the Secretary's action was not arbitrary, capricious or inconsistent with law, plaintiffs' motions as to the regulations governing waste will be denied.

#### (e) *Alluvial Valley Floors*

▪ The Secretary also properly included regulations concerning alluvial valley floors in the interim program. § 715.17(j), 42 Fed.Reg. 62687–62688 (Dec. 13, 1977). Section 510(b)(5), which provides for the regulation of mining in alluvial valley floors, is not included in the interim program provisions listed in § 502(c). The Secretary, however, determined that in order to protect the agricultural uses and water systems of the alluvial valley floors to assure that the provisions of § 510(b)(5) could be meaningfully implemented in the permanent program, regulation of mining in alluvial valley floors was necessary in the interim program. *See* 42 Fed.Reg. 62656–62657.

Clearly the Secretary has the authority to protect the water systems and the hydrologic balance in alluvial valley floors pursuant to section 515(b)(10)(F) which is part of the interim program pursuant to § 502(c). Section 515(b)(10)(F) requires that the hy-

---

**14.** In fact, § 515(b)(3) incorporates other provisions of the Act in reference to the handling of spoil when it states, "such overburden or spoil shall be shaped and graded in such a way as to prevent slides, erosion, and water pollution and is [sic] revegetated in accordance with the requirements of this Act."

**15.** Regulation 715.14(j), which provides for the covering and stabilization of waste materials

and the neutralization of toxic materials to promote plant growth, protect drainage systems, and prevent water pollution, is also properly a part of the interim program pursuant to § 515(b)(3) (approximation of the original contour) and § 515(b)(19) (revegetation). Sections 515(b)(3) and (19) are incorporated into the interim program by § 502(c).

drologic balance be maintained by "preserving throughout the mining and reclamation process the essential hydrologic functions of alluvial valley floors in the arid and semiarid areas of the country." The extension of the regulations by the Secretary beyond the regulation of hydrologic functions was a reasonable exercise of discretion in order to ensure that the provisions of § 510(b)(5) could be implemented in the permanent program.[16] Because the Secretary's actions were not arbitrary, capricious or inconsistent with law the plaintiffs' motions concerning the regulations covering mining in alluvial valley floors will be denied.

### (2) Absence of Adequate Variance Procedures

The second challenge asserted by the plaintiffs in their substantive attack on the regulations is that the interim regulations, as a whole, are invalid because of the Secretary's failure to provide adequate exemption and variance procedures. Plaintiffs contend that the failure to provide such procedures is arbitrary, capricious, and inconsistent with law and that the court should remand the regulations for reconsideration.

In E. I. duPont de Nemours & Co. v. Train, the Supreme Court was faced with a decision of the United States Court of Appeals for the Fourth Circuit remanding regulations promulgated under the Federal Water Pollution Control Act Amendments of 1972 back to the Environmental Protection Agency to provide provisions for exemptions, modifications, and variances from the regulations' requirements. 430 U.S. 112, 97 S.Ct. 965, 979–80, 51 L.Ed.2d 204 (1977). The Court of Appeals had indicated that such provisions were appropriate to the regulatory process. In reversing the Court of Appeals, the Supreme Court stated:

> The question, however, is not what a court thinks is generally appropriate to the regulatory process; it is what Con-

gress intended for these regulations. It is clear that Congress intended these regulations to be absolute prohibitions.

97 S.Ct. at 980.

In the statutory scheme presently before the court, Congress continually rejected broad exemption provisions. See H.R.Rep. No. 93–1522, 93rd Cong., 2d Sess. 18–20 (1974) (exemption for inability to secure equipment rejected); H.R.Rep. No. 94–95, 94th Cong., 1st Sess. (1975) (same). The Senate Report on the bill that evolved into the Act stated:

> The Committee was adamant that there should be no broad exceptions to the vital mining and reclamation. standards of this bill. To provide for unlimited exceptions would render the bill meaningless, since it would then be likely that the exceptions would become the rule. On the other hand, the Committee did recognize that there are some valid and important reasons for allowing limited variances to the prescribed standards of the bill, where such variances provide equal or better protection to the environment, and result in a higher postmining land use. For this reason, there are two provisions in the bill which permit variances to the mining reclamation standards of this bill.

S.Rep. No. 95–128, 95th Cong., 1st Sess. 55 (1977); see H.R.Rep. No. 95–218, 95th Cong., 1st Sess. 115 (1977), U.S. Code Cong. & Admin. News 1977, pp. 593, 648. The two sections that provide the variances referred to are § 711 (experimental practices) and § 515(b)(16) (combined surface and underground mining). The only exemption provided for by Congress is the extremely limited small operators exemption of § 502(c) which gives small operators an additional eight months to comply with the interim performance standards.

■ Throughout the Act Congress made it clear that the only alternative that the operators had was to comply or not conduct

---

16. As the environmental groups point out, irreversible environmental harm to these fragile natural resources could result if mining in alluvial valley floors was left unregulated under the

interim program. This result would be totally contrary to the congressional intent to protect the alluvial valley floors.

operations. To illustrate: (1) § 102(c) states that one of the purposes of the Act is to "assure that surface mining operations are not conducted where reclamation as required by this Act is not feasible;" (2) § 502(c) states that "all surface coal mining operations . . . shall comply" with the provisions included in the interim program; (3) § 510(b) provides that no permit shall be approved unless the applicant demonstrates that reclamation as required by the Act can be accomplished; (4) § 515 states that permits shall require compliance with the performance standards of the Act; and (5) § 522(a)(2) requires that areas be designated unsuitable for all or certain types of surface coal mining operations where "reclamation pursuant to the requirements of this Act is not technologically or economically feasible." Thus, plaintiffs' claim that procedures for the granting of exemptions and variances from all of the regulations are necessary is without merit. The Secretary's decision to allow the States, as the regulatory authority, to approve alternative methods of compliance in several areas was a reasonable exercise of his discretion. *See, e. g.,* 42 Fed.Reg. 62680–62691 (Dec. 13, 1977), Regulations §§ 715.17(a)(1), (2) (haul and access roads); 715.19 (blasting); 715.16 (topsoil handling); 715.13(d) (alternate postmining land use); 715.17(d) (stream diversions); 715.14(b) (final graded slopes). Therefore, plaintiffs' motions concerning the absence of adequate variance and exemption procedures will be denied.

### (3) Pre-existing Structures and Facilities

Section 710.11(d)(2) of the regulations requires any "pre-existing, nonconforming structure or facility" to comply with the regulations by May 4, 1978 unless the regulatory authority finds that compliance is physically impossible and accepts a plan for compliance by November 4, 1978. It is clear that the Act empowers the Secretary to regulate pre-existing, nonconforming structures and facilities that are part of

surface coal mining operations under § 701(28)(B). Plaintiffs do not challenge the applicability of the Act's performance standards to the pre-existing structures. Plaintiffs also accept the fact that pre-existing structures may have to be reconstructed to meet the performance standards of the Act. Plaintiffs do challenge, however, the regulations' requirement that these structures be reconstructed to meet the specific design criteria of the regulations even if the performance standards of the Act can be met without reconstruction.

A settled principle of statutory construction is that in order for a provision to have retrospective application, the requirement must be explicitly and unmistakably set forth in the statute. *Union Pacific R. R. v. Laramie Stockyards,* 231 U.S. 190, 199, 34 S.Ct. 101, 53 L.Ed. 179 (1913); *see Greene v. United States,* 376 U.S. 149, 160, 84 S.Ct. 615, 11 L.Ed.2d 576 (1964); *Farmington River Power Co. v. FPC,* 455 F.2d 86, 90 (2d Cir. 1972). There is no statutory provision in the Act that explicitly requires the reconstruction of already existing structures. This absence of a clear command must be contrasted with the explicit requirement of sections 515(b)(13) and 516(b)(5) that "all *existing* and new coal mine waste piles" be modified, constructed, or removed in accordance with the specific standards and criteria of the regulations promulgated pursuant to § 515(f). 30 U.S.C. §§ 1265(b)(13), 1266(b)(5) (emphasis added). Thus, in one provision Congress did apply the Act retrospectively to require reconstruction of an existing structure in accordance with the design criteria of the regulations.[17] Therefore, this court must conclude that the Act does not explicitly require the reconstruction of pre-existing, nonconforming structures to meet the design criteria of the regulations and thus, the regulations requiring reconstruction are in-

---

17. Congress also has explicitly required the reconstruction of pre-existing, nonconforming structures in other environmental statutes. *See* Federal Water Pollution Control Act

Amendments of 1972, 33 U.S.C. § 1311 (Supp. V 1975); Clean Air Amendments of 1970, 42 U.S.C. § 1857c–5(a)(1), (2) (1970); *cf.* W. Rodgers, *Environmental Law* § 5.7, at 591 (1977).

valid and enforcement of them will be enjoined.[18]

Again, it will be emphasized that pre-existing, nonconforming structures and facilities must still comply with the performance standards of the Act and the regulations. These structures, however, need not be reconstructed if they meet the performance standards but not the design criteria. Therefore, the enforcement of regulation § 710.11(d)(2), to the extent that it requires reconstruction of pre-existing, nonconforming structures and facilities without regard to whether these structures and facilities meet the performance standards of the Act and the regulations, will be enjoined and the regulation will be remanded to the Secretary for reconsideration.

*(4) Scope of the Prime Farmlands Grandfather Exemption*

Plaintiffs challenge the validity of regulations implementing the grandfather provision of prime farmlands section 510(d). Section 510(d)(2) provides:

> Nothing in this subsection shall apply to any permit issued prior to the date of enactment of this Act, or to any revisions or renewals thereof, or to any existing surface mining operations for which a permit was issued prior to the date of enactment of this Act.

Section 510 generally deals with permit approval in the permanent program. Section 510(d)(1) contains the permit requirements for mining on prime farmlands.

Section 716.7(a)(2) of the regulations specifies the permit revisions and renewals covered by the exemption of § 510(d)(2). The regulation is a reasonable exercise of the Secretary's discretion in implementing the statute. The regulation properly limits the scope of the grandfather provision to areas that were either "in the original permit area or in a mining plan approved prior to August 3, 1977" or "[a]re contiguous and under State regulation or

practice would have normally been considered as a renewal or revision of a previously approved plan." Without this limitation, the exemption could be extended to include mine expansions and additions clearly beyond Congress' intent to exempt pre-existing, ongoing mines. *See* S.Rep. No. 95–337, 95th Cong., 1st Sess. 105 (1977) (Conference Report); 123 Cong.Rec. H7583, 7588–89, 7591 (daily ed. July 21, 1977) (remarks of Representatives Udall, Tsongas, and Ruppe); 123 Cong.Rec. S12442 (daily ed. July 20, 1977) (remarks of Senator Metcalf).

The plaintiffs also challenge § 716.7(a)(2) because it limits the scope of the grandfather exemption to the permit application requirements of § 510(d)(1). Under the regulation, the operators will still have to comply with the performance standards of the regulations concerning prime farmlands promulgated pursuant to §§ 515(b)(2) and (5). The grandfather exemption of § 510(d)(2) by its own terms limits its application to the permit provisions of § 510(d)(1) and to the prime farmlands performance standards of § 515(b)(7). The exemption does not apply, however, to regulations promulgated to meet the performance standards of § 515(b)(2) (land restoration) and § 515(b)(5) (topsoil preservation) to the extent that they apply to prime farmlands. The provisions of § 716.7 that are challenged here, however, were promulgated pursuant to § 510(d) and § 515(b)(7). 42 Fed.Reg. 62661 (Dec. 13, 1977). The defendants' reliance on §§ 515(b)(2) and (5) is not supported by the basis and purpose statement published with the regulations. Therefore, enforcement of the provisions of § 716.7, promulgated pursuant to § 510(d) and § 515(b)(7), will be enjoined to the extent that they impose performance standards on operations that are exempt from these requirements pursuant to § 510(d)(2). These provisions also will be remanded to the Secretary for reconsideration.

---

18. The plaintiffs' constitutional claims concerning the regulation under the due process clause of the Fifth Amendment will not be addressed because their disposition is not essential to the proper disposition of this case given the court's statutory interpretation. *Harmon v. Brucker*, 355 U.S. 579, 581, 78 S.Ct. 433, 2 L.Ed.2d 503 (1958) (per curiam).

#### (5) *Topsoil Standards*

Plaintiffs assert that § 715.16(a)(3) of the interim regulations improperly incorporates the subsoil handling requirements of the prime farmlands section of the Act, § 515(b)(7), into the topsoil handling requirements promulgated pursuant to § 515(b)(5). Section 715.16(a)(3) of the regulations, however, is a proper implementation of the command of § 515(b)(5) that other soil strata besides the topsoil layer be segregated and preserved where the other strata are more suitable for vegetation requirements. The regulation also properly implements the land restoration requirements of § 515(b)(2) of the Act. Both § 515(b)(2) and § 515(b)(5) are incorporated into the interim program via § 502(c) of the Act. Because the Secretary's action was not arbitrary, capricious or inconsistent with law, plaintiffs' motions concerning the topsoil handling standards of § 715.16(a)(3) of the regulations will be denied.

#### (6) *Waste Impoundments*

[16] Section 515(b)(13) of the Act, which is included in the interim program under § 502(c), provides for the regulation of wastes "used either temporarily or permanently as dams or embankments." Section 715.18(a) of the regulations provides that:

No waste material shall be used or impounded by existing or new dams without the approval of the regulatory authority.

The plaintiffs challenge the extension of the statutory mandate, in the regulations, to reach dams impounding waste. They assert that the Act only calls for the regulation of dams when waste is used in the construction of a dam. Despite the defendants' arguments to the contrary, § 515(b)(13) on its face does not provide for the regulation of dams that merely impound wastes.

The defendants also rely on the command of § 515(b)(10) that regulations be promulgated to preserve the hydrologic balance at minesite and offsite areas. If the Secretary relied on § 515(b)(10) in promulgating the regulation, however, this reliance was not disclosed in either the regulation or the basis and purpose statement. *See* 42 Fed. Reg. 62658, 62688–89 (Dec. 13, 1977).[19] On its face the regulation only appears to implement § 515(b)(13), although an ancillary effect would be protection of hydrologic functions. Therefore, to the extent that § 715.18 of the regulations imposes standards on dams merely impounding wastes, enforcement of that section will be enjoined and the regulation remanded to the Secretary for reconsideration.[20]

#### (7) *Blasting Limitations*

 Section 715.19(e)(1)(vii) of the regulations provides:

Except where lesser distances are approved by the regulatory authority (based upon a preblasting survey or other appropriate investigations) blasting shall not be conducted within—

(A) 1000 feet of any building used as a dwelling, school, church, hospital, or nursing facility;

(B) 500 feet of facilities including, not not limited to, disposal wells, petroleum or gas-storage facilities, municipal water-storage facilities, fluid-transmission pipelines, gas or oil-collection lines, or water and sewage lines; . . .

The regulation was issued pursuant to § 515(b)(15) of the Act, which is included in the interim program under § 502(c). Section 515(b)(15)(C) requires the promulgation of regulations to prevent injury to persons and property.

---

19. Because the regulation in question was not promulgated pursuant to § 515(b)(10) the court will not decide the issue of the extent to which the Secretary may regulate dams impounding wastes under that section.

20. The plaintiffs also asserted that § 715.18 was invalid because 1) it was promulgated in the interim program rather than pursuant to the 135 days allotted by § 515(f) of the Act; and 2) it failed to promulgate standards and criteria as required by § 515(f). First, § 715.18 was properly promulgated in the interim program 132 days after enactment of the Act. Second, the standards and criteria mandated by § 515(f) are adequately provided in § 715.-18(b) of the regulations.

The plaintiffs contend that the regulation improperly expands the absolute prohibition against surface mining within certain distances of structures contained in § 522(e) of the Act. The blasting prohibition, however, is not absolute and plaintiffs' assertions based on § 522(e) and the exemption within that section are misplaced. The limitations of § 715.19(e)(1)(vii) may be avoided if the approval of the regulatory authority is obtained.[21]

The plaintiffs also challenge the regulation on the ground that it does not disclose the criteria that will be considered by the regulatory authority in approving blasting within lesser distances. The regulation specifically states that approval will be "based upon a preblasting survey or other appropriate investigations." The requirements for a preblasting survey are set forth in §§ 715.19(b) and (e) and include a written report containing "recommendations of any special conditions or proposed adjustments to the blasting requirements outlined in paragraph (e)." § 715.19(b)(3). The requirement of § 715.19(e)(1)(vii) that a pre-blast survey or investigation be done is not meaningless or redundant. Under § 715.19(b)(1) a preblasting survey is only required when requested by the owner or resident of a dwelling or structure "located within one-half mile of any permit area." Section 715.19(e)(1)(vii) automatically requires a preblast survey or investigation in order to obtain the approval of the regulatory authority to blast within the distance limitations set forth in the regulation. This court is of the opinion that in promulgating the blasting regulation being challenged here, the Secretary exercised his discretion in a reasonable manner to protect the health and safety of the public and minimize property damage. *See* 42 Fed.Reg. 62659 (December 13, 1977). Because the Secretary's action was not arbitrary, capricious or inconsistent with law, plaintiffs'

motions concerning § 715.19(e)(1)(vii) will be denied.

### (8) *Manganese Discharges*

Section 715.17(a) of the regulations requires the removal of manganese from alkaline surface water. The plaintiffs challenged this regulation because manganese allegedly only causes aesthetic and not environmental harm. The Secretary has withdrawn the effluent limitations for manganese in § 715.17(a) to the extent that it applies to alkaline waters. The Secretary intends to reconsider the degree to which manganese levels in alkaline waters should be regulated in the permanent program. Therefore, plaintiffs' request for relief is now moot and the court will not address this issue.

### (9) *Small Operators Exemption*

In § 502(c) of the Act, Congress exempted certain operators from complying with the provisions of the interim regulatory program, except § 515(d)(1), until January 1, 1979. This exemption, known as the small operators exemption, applies to surface coal mining operations conducted by a person, as defined by statute, where the "total annual production of coal from surface and underground coal mining operations does not exceed one hundred thousand tons." 30 U.S.C. § 1252(c). Section 710.12 of the regulations implements the statutory provision. The plaintiffs challenge the attribution rules of § 710.12(f), which provide for the attribution of coal produced by other mines owned or controlled by the applicant to him when an exemption is applied for.

■ The plaintiffs contend that the attribution rules are arbitrary because under the regulation the amount of coal attributed to various persons might exceed the actual production of the mine.[22] This result

---

21. Similarly, plaintiffs' contention that the regulation amounts to a taking without due process of law in violation of the Fifth Amendment is without merit. Furthermore, the regulation of uses does not amount to a taking in this case. *See Sierra Club v. EPA,* 176 U.S.App. D.C. 335, 540 F.2d 1114, 1139–40 (1976), *cert.*

denied, 430 U.S. 959, 97 S.Ct. 1610, 51 L.Ed.2d 811 (1977); *South Terminal Corp. v. EPA,* 504 F.2d 646, 678 (1st Cir. 1974).

22. For example, if Permittee A owns 20 percent of operation X, which produces 100,000 tons of coal per year and Permittee B owns 50 percent

alone does not render the regulation arbitrary.[23] Congress was concerned that the exemption only be applied to genuine small operators and that it not exempt operators with a large production via interconnected ownership or control. 123 Cong.Rec. S12443–12444 (daily ed. July 20, 1977) (remarks of Senator Metcalf); see S.Rep. No. 95–337, 95th Cong., 1st Sess. 101–102 (1977). The regulation promulgated by the Secretary ensures, in a reasonable manner, that the small operators exemption will be available to those genuinely entitled to it and not exploited by large producers.[24] Because the Secretary's action was not arbitrary, capricious or inconsistent with law, the plaintiffs' motions concerning the small operators exemption will be denied.

### 10. *Amherst Coal Company's Challenges*

The Amherst Coal Company and certain other plaintiffs also challenge portions of the regulations dealing with (a) sedimentation ponds; (b) effluent limitations; (c) valley fills; and (d) third party commitments.

### (a) *Sedimentation Ponds*

 The plaintiffs challenge §§ 715.-17(e) and 717.17(e) of the regulations which contain design criteria for sedimentation ponds. These regulations, after initially being promulgated on December 13, 1977, were amended on February 27, 1978. 43 Fed.Reg. 8090–93 (Feb. 27, 1978). The federal defendants claim that the objections are premature because the provisions "are not *final* rules; they are merely *interim* final rules." Regardless of the terminology used, the regulations became effective on February 27, 1978. Although the comment period ended on March 29, 1978, the "final" regulations have not yet been promulgated.

Under the government's approach, the plaintiffs would be subject to the requirements of the regulations, but they would be unable to obtain judicial review of the regulations. The court cannot adopt this approach which would leave the plaintiffs without an effective remedy. Because the federal defendants have not addressed the plaintiffs' arguments on the merits, this court cannot effectively review the provisions of the regulations in question. The plaintiffs will suffer imminent irreparable injury if they are required to meet the performance standards of regulations that they contend are arbitrary, capricious and inconsistent with law. Furthermore, the performance standards themselves are subject to change, because the Secretary does not consider them final. Therefore, this court will issue a preliminary injunction enjoining enforcement of the performance standards of §§ 715.17(e) and 717.17(e) of the regulations until the Secretary publishes what he would consider "final interim regulations," the Secretary responds to the plaintiffs' objections in order to allow the court to review the merits of the challenges, and the court reviews the merits of the plaintiff's challenges.

### (b) *Effluent Limitations*

 Section 515(b)(10) gives the Secretary broad authority to protect the hydrologic balance and water quality at all surface mining operation sites and associated offsite areas. Pursuant to that authority, the Secretary promulgated § 715.17(a) of the regulations which includes numerical effluent limitations on "discharges from areas disturbed by surface coal mining and reclamation operations." The plaintiffs contend that the Secretary was not empowered to promulgate regulations setting

---

and has management control of the operation, 20,000 tons would be attributed to A and 100,-000 tons to B. Thus, the result is that 120,000 tons are attributed even though only 100,000 are produced.

**23.** The same result also can occur under the stock ownership attribution rules of the income tax laws. *See* 26 U.S.C. §§ 267(c), 318 (1970).

**24.** The plaintiffs also assert that the five percent beneficial interest cut-off point of the regulations and the five percent permittee attribution of § 710.12(f)(3) are arbitrary and, therefore, invalid. The plaintiffs offer nothing in support of their contentions except the contentions themselves. Therefore, this court must conclude that the plaintiffs failed to sustain their burden of showing that the regulation is arbitrary, capricious or inconsistent with law.

forth numerical effluent limitations.[25] Despite the lack of explicit language authorizing the Secretary to promulgate effluent limitations, however, the Secretary's action was a reasonable exercise of his powers under § 515(b)(10) and is entitled to great deference. *See E. I. duPont de Nemours & Co. v. Train,* 430 U.S. 112, 97 S.Ct. 965, 977–78, 51 L.Ed.2d 204 (1977); *NRDC v. Costle,* 186 U.S.App.D.C. 147, 568 F.2d 1369, 1380 (1977).

■ The plaintiffs also assert that § 715.17(a) of the regulations contravenes § 702(a) of the Act which provides that the regulations shall not supersede, amend, modify or repeal the provisions of the Federal Water Pollution Control Act (FWPCA), 33 U.S.C. §§ 1151–1175.[26] In considering plaintiffs' assertion, the defendants claim that two factors must be noted. First, under § 501(a)(B) of the Act the Secretary may not publish the interim regulations until he has "obtained the written concurrence of the Administrator of the Environmental Protection Agency (EPA) with respect to those regulations promulgated under this section which relate to air or water quality standards promulgated under the authority of the Federal Water Pollution Control Act." This concurrence was obtained on November 18, 1977, 42 Fed.Reg. 62639 (Dec. 13, 1977). Second, under the Act the Secretary was given broad and comprehensive authority to prevent water pollution resulting from surface coal mining operations. To hold that the Secretary could not apply some standards that are stricter than those of the FWPCA the operators would strip him of his authority under § 515(b)(10), according to the defendants.

■ The command of the Act is clear, however. The regulations may not supersede, amend, modify, or repeal the provisions of the FWPCA and regulations promulgated pursuant to its commands. Thus, although the Secretary has the authority to apply the standards of the FWPCA program to the operators and to fill in the gaps of the program with a more comprehensive regulatory scheme, the interim regulations may not impose stricter standards than those specifically set forth in the FWPCA program. To allow the Secretary to do so would amend and modify the FWPCA and ·its regulations. Therefore, the standards of § 715.17(a) of the regulations will be enjoined to the extent that they supersede, amend, repeal or modify the provisions of the FWPCA and its regulations.

### (c) *Valley Fills*

Section 715.15 of the regulations governs the disposal of spoil and waste in areas other than mine workings or excavations. In an earlier portion of this opinion, this court upheld the Secretary's authority to regulate soil and waste disposal in the interim program. *See* p. 336, *supra.* In addition to their challenge of the regulation as a whole, Amherst and others also assert that portions of § 715.15(b), which deals with spoil disposal in valley or head-of-hollow fills, are invalid. The provisions in question deal with drainage in these fills. Plaintiffs object to the regulation because it does not allow the rock core drainage methods that are currently used in West Virginia and approved by that state's regulatory program.

In the basis and purpose statement that precedes the regulations, the Secretary specifically addressed the objections raised by the plaintiffs. 42 Fed.Reg. 62647–48 (Dec.

---

**25.** The plaintiffs also assert that compliance is impossible. As was noted earlier, Congress left the operators only one alternative in the Act, surface coal mining operations must comply with the Act and the regulations or cease operating. *See* pp. 338–339, *supra.*

**26.** Amherst claims that the regulations promulgated under the Surface Mining Control and Reclamation Act improperly supersede, amend, modify and repeal: (1) the variance procedure

contained in EPA's effluent limitation regulations for the coal mining point source category, 40 C.F.R. §§ 434.22, 434.32 & 434.42, 42 Fed. Reg. 21380 (April 26, 1977); (2) the exemption for unusual precipitation events in the same regulations and its effect on sedimentation pond design, 40 C.F.R. §§ 434.22(c), 434.32(b), & 434.42(b); and (3) the provisions for area wide waste treatment management planning of § 208 of the FWPCA, 33 U.S.C. § 1288.

13, 1977). The Secretary concluded that rock core drainage would be inappropriate because of problems of instability, erosion, and water pollution. This court cannot conclude on the basis of the plaintiffs' assertions that the Secretary's decision was arbitrary, capricious or inconsistent with law. Therefore, plaintiffs' motions concerning § 715.16(b) will be denied.

### (d) *Third Party Commitments*

■ Finally, Amherst and others challenge § 715.13(d)(4) of the regulations which requires an applicant for a permit to mine mountaintop areas to file, in certain situations, letters of financial commitment from third parties. Under § 515(c)(2) of the Act, an operator may create a relatively flat surface after mountaintop surface mining, rather than restoring the land to its original contour, if certain conditions are met. One of the conditions for obtaining a permit to leave a flat surface is that the applicant present "specific plans for the proposed postmining land use and appropriate assurances that such use will be . . practicable with respect to private financial capability for completion of the proposed use." § 515(c)(3)(B)(v), 30 U.S.C. § 1265(c)(3)(B)(v). Pursuant to the command of § 515(c)(5) that specific provisions governing the granting of permits be promulgated, the Secretary issued the regulation in question.

Section 715.13(d)(4) of the regulations requires permit applicants to submit:

> Specific and feasible plans for financing attainment and maintenance of the postmining land use including letters of commitment from parties other than the permittee as appropriate, if the post-mining land use is to be developed by such parties.

The plaintiffs contend that obtaining such commitments from third parties will be impossible and therefore, permits for mountaintop removal mining will be impossible

to obtain. Plaintiffs assert that third parties will not be willing to make such a commitment before a permit is issued and mining has begun, which could be two–five years before the postmining land use is to commence. The Secretary's action, however, was an appropriate implementation of the provisions of the Act. The legislative history indicates that Congress only intended to allow mountaintop removal mining where commitments and assurances concerning postmining use were given prior to the issuance of a permit. *See* H.R.Rep. No. 95–218, 95th Cong., 1st Sess. 94, 124 (1977). Furthermore, letters of commitment from third parties concerning financing are not absolutely required by the regulation and they are only necessary where appropriate. Therefore, this court must conclude that the Secretary's action in promulgating § 715.-13(d)(4) was not arbitrary, capricious or inconsistent with law and plaintiffs' motions concerning that regulation will be denied.

### III. *Environmental Plaintiffs' Motion for Summary Judgment*

The National Wildlife Federation and other environmental groups move for summary judgment on the only issue raised in their complaint: whether the Secretary exceeded his authority in promulgating sections 710.11(d)(2) and (3) of the regulations. *See* 30 C.F.R. § 710.11(d)(2), 42 Fed.Reg. 62679 (Dec. 13, 1977), *as amended*, 43 Fed. Reg. 5001 (Feb. 7, 1978) (pre-existing, nonconforming structures and facilities); 30 C.F.R. § 710.11(d)(3), 43 Fed.Reg. 8091 (Feb. 27, 1978) (sedimentation ponds). The regulations in question implement § 502(c) of the Act which requires that all pre-existing facilities and structures be in compliance with the performance standards of the Act by May 4, 1978. *See* p. 339, *supra*. Under §§ 710.11(d)(2) and (3) the Secretary provides a procedure whereby operators may receive an extension of time within which to comply with the performance standards from May 4, 1978 to November 4, 1978.[27]

---

**27.** Section 710.11(d)(2) allows operators up to a six month extension of the compliance deadline for pre-existing, nonconforming structures or facilities if the following conditions are met:

(1) the operator submits to the regulatory authority by March 1, 1978 a statement "demonstrating that it is physically impossible to bring the structure or facility into compliance by

The environmental plaintiffs contend that these extension provisions are invalid.

■■■ At issue here is a narrow extension of time for compliance in accordance with a plan for compliance, as opposed to the broad exemptions and variances sought by the industry plaintiffs that were discussed earlier. *See* pp. 338–339, *supra.* This court is of the opinion that the limited variances allowed by these regulations are not contrary to the mandates of the Act and that the Secretary's action was not arbitrary, capricious or inconsistent with law. Even though the court has concluded that Congress intended that the operators must comply with the performance standards of the Act and the regulations or not conduct operations, this command does not strip the Secretary of all authority to grant limited variances. Congress also expressed its concern in § 102(f) of the Act "that the coal supply essential to the Nation's energy requirements, and to its economic and social well-being is provided."

The court has been presented with two entirely different issues concerning variance procedures in this case. The limited variance procedures provided by the Secretary in §§ 710.11(d)(2) and (3), as part of the comprehensive interim program of regulation of surface coal mining, were a reasonable exercise of his discretion and in accordance with congressional intent and therefore, entitled to great deference by this court. On the other hand, the industry plaintiffs did not meet their burden of showing that the Secretary's failure to provide a broad exemption and variance procedure was arbitrary, capricious or inconsistent with law or that such a procedure was contemplated by Congress for these regulations. Because the limited variance procedures of §§ 710.11(d)(2) and (3) are reasonable and not inconsistent with the Act, the environmental plaintiffs' motion for summary judgment will be denied.

May 4, 1978," § 710.11(d)(2)(i); (2) the regulatory authority makes a written finding of physical impossibility; and (3) construction begins by May 4, 1978 and all work is completed by November 4, 1978. A similar six month extension may be obtained for sedimentation ponds

IV. *Order*

Therefore, in accordance with the Memorandum Opinion above, it is, by this court, this 3rd day of May, 1978,

ORDERED that all of plaintiffs' motions for summary judgment and for a preliminary injunction be, and the same hereby are, denied except:

(1) plaintiffs' motion for summary judgment concerning § 710.11(d)(2) of the regulations will be granted and to the extent that § 710.11(d)(2) requires reconstruction of pre-existing, nonconforming structures and facilities without regard to whether these structures and facilities meet the performance standards of the Act and the regulations, enforcement will be enjoined and the regulations will be remanded to the Secretary of Interior for reconsideration;

(2) plaintiffs' motion for summary judgment concerning § 716.7 of the regulations will be granted and enforcement of § 716.7 will be enjoined to the extent that it imposes performance standards on operations that are exempt from its requirements pursuant to § 510(d)(2) of the Act and the regulation will be remanded to the Secretary for reconsideration;

(3) plaintiffs' motion for summary judgment concerning § 715.18 of the regulations will be granted and to the extent that § 715.18 imposes standards on dams merely impounding wastes, enforcement of that section will be enjoined and the regulation remanded to the Secretary for reconsideration;

(4) plaintiffs' motion for a preliminary injunction concerning §§ 715.17(e) and 717.-17(e) of the regulations will be granted and enforcement of the performance standards of §§ 715.17(e) and 717.17(e) will be enjoined until the Secretary publishes these two regulations as "final interim regula-

under § 710.11(d)(3) if the statement of physical impossibility is submitted by May 3, 1978, the regulatory authority approves the exemption in writing, and construction begins by June 3, 1978 and is completed by November 4, 1978.

tions," the Secretary responds to plaintiffs' objections to these regulations in order to allow this court to review the merits of the challenges, and the court reviews the merits; and

(5) plaintiffs' motion for a preliminary injunction concerning § 715.17(a) of the regulations will be granted and to the extent that § 715.17(a) supersedes, amends, repeals and modifies the provisions of the Federal Water Pollution Control Act and its regulations, enforcement of the regulation will be enjoined.