**MANHATTAN–BRONX POSTAL UNION et al., Appellants,**

**v.**

**John A. GRONOUSKI, individually and as Postmaster General of the United States, Appellee.**

**No. 18882.**

United States Court of Appeals District of Columbia Circuit.

Argued March 16, 1965.

Decided July 29, 1965.

---

452

Mr. Roy C. Frank, Washington, D. C., for appellants.

Mr. Jerome Nelson, Asst. U. S. Atty., with whom Messrs. David C. Acheson, U. S. Atty., and Frank Q. Nebeker and Mrs. Ellen Lee Park, Asst. U. S. Attys., were on the brief, for appellee.

Before WILBUR K. MILLER, Senior Circuit Judge, and DANAHER and McGOWAN, Circuit Judges.

McGOWAN, Circuit Judge.

Appellants sought declaratory and injunctive relief in the District Court against appellee, the Postmaster General of the United States. Appellant Manhattan-Bronx Postal Union is an affiliate of the National Postal Union, a labor organization representing postal employees.

Appellant Petre is a postal employee and a member of Manhattan-Bronx. They complain of appellee's refusal to recognize Manhattan-Bronx as the exclusive representative of certain employees in the New York City post office. This refusal is claimed to have been founded upon an arbitrary, capricious, and unlawful act by appellee in contravention of the terms of an Executive Order. We affirm the District Court's dismissal of the suit.

I

Executive Order 10988, issued January 18, 1962, 27 Fed.Reg. 551, grew out of the report of the President's Task Force on Employee-Management Relations in the Federal Service. That report recognized the frustrations that not infrequently assail federal employees as they observe the organizational activities of workers in private industry and what they assume to be the correspondingly greater role of the latter in the shaping of employment policies. Although the complete assimilation of the one type of employment to the other was thought to be impossible, the Order was intended to provide a framework for the collective expression by federal employees of their views about the terms and conditions of their employment. This was a project of the Executive, and not of the Congress. Executive Order 10988 does not, in its recitals, refer to any statute other than the Act of March 3, 1871, 5 U.S.C. § 631, which generally authorizes the President to issue regulations for the admission of persons into the civil service of the United States and for the governance of their conduct thereafter. The President, thus, was under no obligation to issue the Order; and his action in doing so was simply in furtherance of a personal policy of trying to enhance the attractiveness and efficiency of federal employment.

In the Order the President designated levels of recognition status for employee organizations—informal, formal, and exclusive.[1] To achieve recognition as the

1. Under the terms of the Order, "informal" recognition is extended to any organization of employees. This entitles

such organization to submit its views from time to time on any matter of concern to its members, but it need not be con-

exclusive representative of a particular unit, the Order provided that an organization must have been "designated or selected by a majority of the employees of such unit." The Order elsewhere directed the head of each agency, not later than July 1, 1962, to issue appropriate rules and regulations for its implementation, including "policies and procedures with respect to recognition of employee organizations" for purposes of exclusive recognition. The Civil Service Commission was expressly adjured to "establish and maintain a program to assist in carrying out the objectives of this order," and to furnish guidance and advice to the agencies. Lastly, the Order established a Temporary Committee on the Implementation of the Federal-Employee Management Relations Program, chaired by the Secretary of Labor and with the Secretary of Defense, the Postmaster General, and the head of the Civil Service Commission as the other members. The function of this Committee was to advise the President on the working of the program and to be generally helpful in its implementation.

It was this Committee which first formally recommended the rule of which appellants now complain. In response to a request for advice upon whether exclusive recognition should require an absolute majority of employees eligible to vote, or a simple majority of those actually voting, the Committee recommended that the agencies uniformly require that, where less than an absolute majority vote for one organization was cast, there be a majority of those voting in a "representative election"; and it defined the latter as one in which a minimum of 60 per cent of the eligible voters actually voted. It contemplated that, in special cases, an agency might determine that "a per-

centage slightly less than 60% is representative." The Civil Service Commission, on April 24, 1962, transmitted this advice to all the agencies with its endorsement. On May 25 following, the Post Office Department issued a Postal Bulletin, to be displayed on employee bulletin boards and elsewhere, announcing and explaining the 60 per cent rule.

Appellants initiated this litigation against the Postmaster General in respect of the New York City unit on January 7, 1964. A principal complaint was that the use of an authorization card system was unfair. After the filing of a Supplemental and Amended Complaint, the parties stipulated that an election by secret ballot would be held. In this selection, only 57.07 per cent of the eligible voters voted, of which Manhattan-Bronx received a majority. Accordingly, appellee denied Manhattan-Bronx exclusive recognition, refusing to waive the 60 per cent rule in this instance because only 13 of some 6500 ballot kits had been returned as undeliverable, suggesting that many employees had deliberately refrained from voting.

A further Supplemental Complaint filed by appellants attacked this denial of exclusive representational status and asked the court to declare Manhattan-Bronx to be the exclusive representative of the unit, and, in effect, to enjoin appellee from taking any action inconsistent with that status.[2] Appellee filed a motion for summary judgment, accompanied by certain documentary materials. When that motion came on to be heard in open court, it was stipulated by the parties that (1) the motion might be considered alternatively as a motion to dismiss, and (2) summary judgment could be entered for appellants if the court found in their favor. The order thereafter entered by

sulted. "Formal" recognition is to be had when no other organization in the unit has achieved exclusive rights, and when not less than 10% of the employees in the unit are members. It entitles the organization not only to volunteer its views, but also to be consulted about personnel policies and practices, and about working conditions of concern to

its members. "Exclusive" recognition means that the organization may negotiate agreements covering all employees in the unit.

2. The material portions of appellants' prayer for relief are set out at page 454, *infra.*

the court alternatively dismissed the action for lack of jurisdiction over the subject matter, and awarded summary judgment to appellee.

## II

◼ While appellants' claim on the merits appears to raise only the issue of whether appellee's adherence to the 60 per cent rule transgressed the President's Order and was, thus, unlawful, arbitrary, and capricious, we need not reach the trial court's alternative resolution of that question. We affirm instead its dismissal of the complaint, on two grounds. Appellants' suit, in effect, is one against the United States, which cannot be maintained without its consent. Moreover, the right they seek to assert in this instance is not, in our view, appropriate for judicial vindication.

◼◼ The Supreme Court has made clear that a plaintiff's denomination of the party defendant is not the test of whether the suit is in fact against the United States. Many cases, both before and since Larson v. Domestic and Foreign Commerce Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949), have recognized that "the crucial question is whether the relief sought in a suit nominally addressed to the officer is relief against the sovereign." [3] 337 U.S. at 687, 69 S.Ct. at 1460. A suit is against the United States if the judgment sought would require the payment of public funds or entail the transfer of public lands, or if it would interfere with the public administration by either restraining the Government from acting or requiring it to act. See Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15

(1963); Land v. Dollar, 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947); Seiden v. Larson, 88 U.S.App.D.C. 258, 188 F.2d 661, cert. denied, 341 U.S. 950, 71 S.Ct. 1017, 95 L.Ed. 1373 (1951). The decree requested by appellants would declare Manhattan-Bronx to be the exclusive representative of the postal employees in the New York City unit, and is no doubt intended to impose upon the Postmaster General the obligation of treating it as such. Appellants also seek permanently to prevent appellee, "his agents, employees and attorneys," from:

(a) Decertifying plaintiff, Manhattan-Bronx, as the exclusive representative of the mail handlers unit at the New York post office.

(b) Certifying that plaintiff, Manhattan-Bronx, was not designated by the employees of the mail handlers unit at the New York post office as the exclusive representative of said unit, effective as of July 4, 1964.

(c) Certifying Local No. 1 and plaintiff, Manhattan-Bronx as entitled to formal recognition of the mail handlers unit at the New York post office.

◼ That there may be circumstances in which specific relief against an officer is not relief against the United States is, of course, no less well-recognized. See Larson v. Domestic and Foreign Commerce Corp., supra, 337 U.S. at 689–690, 69 S.Ct. 1457; Philadelphia Co. v. Stimson, 223 U.S. 605, 32 S.Ct. 340, 56 L.Ed. 570 (1912).[4] But such circumstances are not present here. Appellants do not contend that either appellee's assumption of authority to accord recognition to the representatives of employees within the Post Office Department, or his exercise

3. See, e.g., State of Hawaii v. Gordon, 373 U.S. 57, 83 S.Ct. 1052, 10 L.Ed.2d 191 (1963); Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963); Wells v. Roper, 246 U.S. 335, 38 S.Ct. 317, 62 L.Ed. 755 (1918); State of Minnesota v. Hitchcock, 185 U.S. 373, 22 S. Ct. 650, 46 L.Ed. 954 (1902).

4. In the language of the Supreme Court, the exceptions to the general rule of immunity are: "(1) action by officers be-

yond their statutory powers and (2) even though within the scope of their authority, the powers themselves or the manner in which they are exercised are constitutionally void." Dugan v. Rank, supra, 372 U.S. at 621–622, 83 S.Ct. at 1007. See also Malone v. Bowdoin, 369 U.S. 643, 82 S.Ct. 980, 8 L.Ed.2d 168 (1962); Doehla Greeting Cards, Inc. v. Summerfield, 97 U.S.App.D.C. 29, 227 F. 2d 44 (1955); Fay v. Miller, 87 U.S.App. D.C. 168, 183 F.2d 986 (1950).

thereof in this instance, violated any provision of the Constitution. See Dugan v. Rank, *supra*. They do claim that his adoption of and adherence to the 60 per cent rule is "in violation of" Executive Order No. 10988. But, even if true, this would not in our view establish that appellee's actions were clearly beyond his legal authority.[5] The Postmaster General's responsibility for the administration of Government employment policies and regulations within his department is unquestioned. By the terms of the order, he, like the heads of other agencies, was, in his administration of the Post Office Department, directed to carry out the policies therein expressed. He was instructed to adopt appropriate regulations and procedures to achieve that purpose. Presumably the President foresaw that such regulations and procedures should not be uniform throughout the Government, for he left their formulation and adoption to the heads of the various agencies. It would thus appear that the President intended to allow his subordinates some considerable flexibility in the implementation of his objective.

■ Appellants maintain, however, that the area of appellee's allowable discretion did not extend to the adoption of Section 6(a) of the Order, set forth in the 60 per cent rule. They contend that the margin,[6] *requires* appellee to designate, as the exclusive representative of a unit, any organization that receives a majority of the votes cast in an election in which a majority of the members of the unit vote. Thus, they say, appellee's failure to do so in this instance violated the terms of the Order and was in excess of his authority. But, whatever the construction given it in other contexts,[7] the language of Section 6(a) on its face does not immediately suggest the reading appellants urge that it compels. The President may have intended his subordinates to follow the assertedly familiar construction of this language, but neither the circumstances of his issuance of the Order, nor the report of the Temporary Committee, makes this conclusion inescapable. The short of appellants' case is that appellee has misconstrued the President's instructions, and the law is clear that an officer of the United States does not act outside his authority whenever he acts upon an erroneous decision of law or fact, if he is empowered to make the decision. See Larson v. Domestic and Foreign Commerce Corp., *supra*, 337 U.S. at 695, 703, 69 S.Ct. 1457; Arizona ex rel. Arizona State Bd. of Public Welfare

5. See Larson v. Domestic and Foreign Commerce Corp., *supra*, 337 U.S. 689–690, 69 S.Ct. 1461:
    [W]here the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions. The officer is not doing the business which the sovereign has empowered him to do or he is doing it in a way which the sovereign has forbidden. His actions are *ultra vires* his authority and therefore may be made the object of specific relief. It is important to note that in such cases the relief can be granted, without impleading the sovereign, only because of the officer's lack of delegated power. A *claim of error in the exercise of that power is therefore not sufficient.* [Emphasis added.]

6  Executive Order No. 10988, Section 6(a), provides in pertinent part as follows:
    An agency shall recognize an employee organization as the exclusive

representative of the employees, in an appropriate unit when such organization is eligible for formal recognition pursuant to section 5 of this order, and has been *designated or selected by a majority of the employees of such unit* as the representative of such employees in such unit. [Emphasis added.]

7. Appellants point out that substantially identical language in Section 9(a) of the National Labor Relations Act, 49 Stat. 453 (1935), as amended, 29 U.S.C. § 159 (a), and in the Railway Labor Act, 44 Stat. 577 (1926), as amended, 45 U.S.C. § 152, has been judicially construed as they urge Section 6(a) must be. See NLRB v. Whittier Mills Co., 111 F.2d 474 (5th Cir. 1940); Virginia Ry. Co. v. System Federation No. 40, Ry. Employees, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937).

v. Hobby, 94 U.S.App.D.C. 170, 221 F.2d 498 (1954); Seiden v. Larson, *supra*, 88 U.S.App.D.C. at 263, 188 F.2d at 666.

### III

Appellants' claim that jurisdiction does exist rests primarily upon the general equity powers of the District Court. 11 D.C.Code § 306 (1961 ed.). Those powers have on occasion in the past been successfully invoked to secure relief against various representatives of the federal establishment. But it has been commonly recognized that, in order to avoid the rock of sovereign immunity, on the one hand, and to maintain a reasonably acute sensitivity to the fundamental implications of the separation of powers, on the other, the occasion must be a compelling one.[8]

Executive Order 10988 represents in essence a formulation of broad policy by the President for the guidance of federal employing agencies. It had no specific foundation in Congressional action, nor was it required to effectuate any statute. It could have been withdrawn at any time for any or no reason. It represented simply one President's effort to move in the direction of what he had been advised by his experts would be an improvement in the efficiency of federal employment. As we have indicated, he imposed no hard and fast directives on the many different kinds of federal employees; and he left large areas for the exercise of discretion at levels below the summit, although he went to some pains to provide continuing advisory services from those people and agencies within his Administration equipped with special knowledge or experience in personnel matters.

■ The President did not undertake to create any role for the judiciary in the implementation of this policy. The question of his power to do so aside, he was, at least in this matter of determining representational rights, emulating the example of Congress, which has shown a marked disinclination to intrude equity courts into this process.[9]

■ The Postmaster General decided to follow the advice of the President's Temporary Committee, and to apply the 60 per cent rule as a means of assuring the representative character of an election to determine whether one organization should have the exclusive right to represent all the employees in the unit. That action does not seem to us to conflict with the Executive Order.[10] But,

---

8. See, *e.g.*, United States ex rel. Greathouse v. Dern, 289 U.S. 352, 53 S.Ct. 614, 77 L.Ed. 1250 (1933); Morrison v. Work, 266 U.S. 481, 45 S.Ct. 149, 69 L.Ed. 394 (1925); Mitchell v. McNamara, No. 19,132, Decided July 6, 1965; Pauling v. McNamara, 118 U.S.App.D.C. 50, 331 F.2d 796 (1963), cert. denied, 377 U.S. 933, 84 S.Ct. 1336, 12 L.Ed.2d 297 (1964).

9. See Switchmen's Union of North America v. National Mediation Board, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61 (1943); Local 130, Int'l Union of Elec., Radio and Mach. Workers v. McCulloch, 120 U.S. App.D.C. ——, 345 F.2d 90 (1965). This is not a case where judicial review is required by the Constitution, see Estep v. United States, 327 U.S. 114, 120, 66 S.Ct. 423, 90 L.Ed. 567 (1946), nor in which the absence of a judicial forum would mean "a sacrifice or obliteration of a right which *Congress had created.*" (Emphasis added.) Switchmen's Union of North America v. National Mediation Board, supra, 320 U.S. at 300, 64 S.Ct. 95, 97; see Leedom v. Kyne, 358 U.S 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958).

10. We note in this regard that the Chairman of the Temporary Committee which recommended the 60% rule in the first instance was the same Secretary of Labor who had served as Chairman of the Task Force which gave rise to the Executive Order. Apart from the broad flexibility which characterizes that Order generally, it hardly seems likely that the Temporary Committee would have deliberately flouted its terms. The record also shows that, even before the Temporary Committee's advice on the 60% rule was circulated, the head of the national union with which Manhattan-Bronx is affiliated had, in a conversation with an Assistant Postmaster General, signified his understanding that the percentage figures used in the Order to determine status "relate to the total number of employees eligible to vote in a unit and *not* to the number of votes actually cast."

even if it did, it does not follow that appellants have a right of such nature as to warrant intervention by an equity court. If appellants disagreed with the Postmaster General's decision as to this aspect of personnel policy, and believed it to be contrary to the President's wishes, it is obvious to whom their complaint should have been directed. It was not to the judicial branch. Congress has given the District Court many important functions to perform, but they do not include policing the faithful execution of Presidential policies by Presidential appointees.

The dismissal of the action is

Affirmed.

(Emphasis in original.) Thus, the construction of the Order now pressed by appellants may hardly be thought to have

been generally regarded as compelled by the words used.