UNITED STATES of America, Plaintiff,

v.

David Alan WAYTE, Defendant.

No. CR 82–630 TJH.

United States District Court,
C.D. California.

Nov. 15, 1982.

**1378**

Stephen S. Trott, U.S. Atty., Alexander H. Williams, III, Chief Asst. U.S. Atty., Richard R. Romero, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff.

William G. Smith, Terry Amdur, Dan Stormer, ACLU Foundation of So. California, Mark D. Rosenbaum, ACLU, Los Angeles, Cal., for defendant.

## ORDER AND OPINION

HATTER, District Judge.

### Background

Defendant David Alan Wayte was indicted on July 22, 1982 for failure to register for the draft under section three of the Military Selective Service Act ("Act"), as amended, 50 U.S.C.App. § 453. Wayte had previously written two letters to the President expressing his opposition to draft registration and his intention not to register.

Defendant moves this court to dismiss the indictment on several bases. First, defend-

1. On October 29, 1982, this court issued an Order which set out the court's rationale for making its *prima facie* finding of selective prosecution. Additionally, the October 29th Order directed that the Government provide defendant with certain documents and that Edwin Meese III, Counselor to the President, testify at the evidentiary hearing on selective prosecution. The Order specifically addressed the Government's contention that defendant should not receive any of the documents due to the Government's invocation of a qualified executive privilege.

The October 29th Order stated in part:

ant urges this court to dismiss the indictment on the ground that the Government has refused to comply with this court's Order of October 29, 1982.[1]

Second, the court ordered Edwin Meese III, Counselor to the President, to appear as a witness in an evidentiary hearing on selective prosecution. Mr. Meese has refused to comply with the court's order. Therefore, defendant moves the court for dismissal of the indictment as the appropriate sanction for the Government's recalcitrance.

Third, defendant asserts that the Government has not rebutted the court's *prima facie* finding of discriminatory prosecution.

Finally, defendant seeks dismissal of the indictment on the basis that the Selective Service System's draft registration regulations and Presidential Proclamation 4771 ("the Proclamation") were illegally promulgated and, therefore, invalid.

Each of defendant's asserted bases for dismissal of the indictment will be addressed.

I. Appeal Under 18 U.S.C. § 3731 In Relation To A Claim Of Executive Privilege

■ As an initial matter, this court is compelled to question the Government's conduct with regard to its defiance of this court's Order of October 29, 1982. The Government contends that it is entitled to invoke the doctrine of executive privilege over both the documents this court has ordered it to make available to defendant and any subject matter that would be the basis of Mr. Meese's testimony.

> The standard for determining whether an assertion of executive privilege is valid was announced in *United States v. Nixon*, 418 U.S. 683 [94 S.Ct. 3090, 41 L.Ed.2d 1039] (1974).
>
> Applying the balancing test from *Nixon* to the facts, this court finds that the scales of justice tip decidedly in favor of the defendant's right to review several of the documents which this court has inspected *in camera*. The Government's generalized assertion of a "deliberative process" executive privilege must yield to the defendant's specific need for documents, which this court has determined must be released to Mr. Wayte.

This court offered to the Government the opportunity to seek the resolution of the impasse between it and the court by way of certification of the Government's claim of executive privilege for appellate review by the Ninth Circuit. The court stated that it would stay this proceeding in an attempt to encourage the Government to seek an appeal.

The Government has refused to appeal the issue of executive privilege and instead has asserted that the court does not have the authority to provide the Government with an opportunity to appeal the court's Order. Rather, the Government argues, the only way to achieve appellate review of the Government's assertion of executive privilege is for the court to dismiss the indictment against defendant. This court disagrees with the Government's position.

In *Nixon v. Sirica,* 487 F.2d 700 (D.C.Cir. 1973), the court addressed the issue of whether or not 28 U.S.C. § 1291 and 18 U.S.C. § 3731 allowed the district court to grant a former President an opportunity to appeal in light of a potential claim of executive privilege. *Id.* at 721, n. 100. The court decided that the "District Court's rulings on particularized claims [of privilege] would be appealable by the ... Special Prosecutor under 18 U.S.C. § 3731" (citations omitted).[2]

In light of *Sirica,* it appears well settled that the Government, in the present case, could have pursued an avenue of appeal which would have fallen far short of calling for the dismissal of the indictment. The fact that this is a criminal proceeding does not alter the situation.

II. *Prima Facie* Finding of Selective Prosecution

On September 30, 1982, this court conducted a hearing to determine whether the defendant was entitled to an evidentiary hearing on his claim of selective prosecution. To be granted an evidentiary hearing, the defendant must allege enough facts to take the question beyond the frivolous stage. *United States v. Erne,* 576 F.2d 212, 216 (9th Cir.1978).

The defendant has clearly met this standard. During the September 30, 1982 hearing, evidence was presented that hundreds of thousands of young men have failed to register for the draft. A conservative figure would be over 500,000 men. Further, it was established that the Government has a "passive" enforcement policy, which has resulted in the indictments and prosecutions of only vocal non-registrants. The definition of vocal as used by both the Government and the defendant includes non-registrants who were reported by third parties, as well as those who were self-reported. At the time of the hearing, eleven men, including the defendant, had been indicted for failure to register.[3] These facts

---

**2.** It is of particular interest to this court that *Sirica* involved issues of both civil and criminal procedure. The circuit court was quite careful to point out that the President could seek an interlocutory appeal of the District Court's rulings under 28 U.S.C. § 1291 (interlocutory appellate review in civil proceedings) while the Special Prosecutor could seek review under 18 U.S.C. § 3731 (interlocutory appellate review in criminal proceedings). *See Nixon v. Sirica,* 487 F.2d 700 at 721, n. 100.

The relevant part of 18 U.S.C. § 3731 provides:

In a criminal case an appeal by the United States shall lie to a court of appeals from a decision, judgment, or order of a district court dismissing an indictment or information as to any one or more counts, except that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution.

An appeal by the United States shall lie to a court of appeals from a decision or order of a district court's suppressing or excluding evidence ... if the United States Attorney certifies to the district court that appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding.

The appeal in all such cases shall be taken within thirty days after the ... order has been rendered and shall be diligently prosecuted.

. . . .

The provisions of this section shall be *liberally construed to effectuate its purposes* (emphasis added).

**3.** Since that date, two more young men have been indicted, bringing the total to thirteen. These two additional men are also vocal non-registrants.

both demonstrated that the question was not frivolous and, further, helped to establish the *prima facie* case of selective prosecution.

■ Mere selectivity in prosecution, standing alone, creates no constitutional problem. *Oyler v. Boles,* 368 U.S. 448, 456, 82 S.Ct. 501, 505, 7 L.Ed.2d 446 (1962). The courts have established a two-prong test for establishing a *prima facie* case. The defendant must show (1) that others similarly situated generally have not been prosecuted for conduct similar to that for which the defendant was prosecuted, and (2) that the Government's discriminatory selection of defendant for prosecution was based on impermissible grounds such as race, religion or exercise of the defendant's first amendment right of free speech. *United States v. Scott,* 521 F.2d 1188, 1195 (9th Cir.), *cert. denied,* 424 U.S. 955, 96 S.Ct. 1431, 47 L.Ed.2d 361 (1975); *United States v. Berrios,* 501 F.2d 1207, 1211 (2d Cir.1974).

■ Equal protection of the laws is not limited to enacting fair and impartial legislation, but necessarily extends to the application of these laws. *United States v. Falk,* 479 F.2d 616, 618 (7th Cir.1973). This basic principle was recognized by the Supreme Court long ago in *Yick Wo v. Hopkins,* 118 U.S. 356, 373–74, 6 S.Ct. 1064, 1072–73, 30 L.Ed. 220 (1886).

In *Yick Wo,* the city of San Francisco made it illegal to maintain a laundry without permission of the board of supervisors unless the laundry was located in a brick or stone building. Although the law appeared fair on its face, the facts showed that principally Chinese laundry operators were denied permission to continue using wooden facilities. The Supreme Court held that criminal enforcement of the law was therefore illegal. As the *Falk* court pointed out,

> *Yick Wo* was concerned with an abuse of discretion in the administration of a public ordinance by a city licensing board, and not with the activities of law enforcement officials who presumably prosecuted all Chinese who violated the commands of the licensing board. The underlying principle has nevertheless been *properly held to apply to the actions of prosecutors and police officials.*

479 F.2d at 618 (emphasis added).

More recently, in *United States v. Steele,* 461 F.2d 1148 (9th Cir.1972), the defendant was convicted of violating 13 U.S.C. § 221(a) by refusing to answer questions on the Department of Commerce Census Form of 1970. Steele and six other unrelated people resided in a private house in Honolulu, Hawaii. He refused to answer the census questions because it might have disclosed a violation of the Honolulu Zoning Code.

Steele raised the selective prosecution defense at his trial. Only four persons in Hawaii had been prosecuted for violating § 221(a). All four had been vocal opponents of the census and had urged the public not to comply with census requirements. *Id.* at 1150–51.

Steele attempted to prove that there were others similarly situated who had not been prosecuted. The United States Attorney's office stated that this information was not available. However, Steele located six persons who had not completed the census form and had not been prosecuted. None of these people had taken a public stand against the census. *Id.* at 1151.

A census official testified that, to the best of his recollection, the four people prosecuted were the only ones who refused to cooperate. Steele's evidence regarding the other six showed that, at the very least, the official's memory was faulty.

The Ninth Circuit reversed Steele's conviction based on selective prosecution. The census bureau had an information gathering system that should have compiled the names of all those who refused to cooperate. While the census official recollected only four people who refused to comply, the evidence suggested a minimum of ten. The court stated that this fact alone strongly suggested a questionable emphasis on census resisters. *Id.* at 1152.

The facts in *Steele* are similar to those in the instant case. Defendant has shown that the Government has the ability to lo-

cate more than one-tenth of one percent of at least 500,000 non-registrants. On July 9, 1982, a memorandum entitled "Prosecution of Selective Service Non-Registrants" was sent to United States Attorneys (Mid-Sized Offices) from D. Lowell Jensen, Assistant Attorney General, Criminal Division.[4]

In the memorandum, Mr. Jensen pointed out that the Selective Service System now has access to all Social Security records[5] and has "nearly implemented an 'active' enforcement policy," based on the use of those records to identify non-registrants. If an active system were implemented, the memorandum anticipated that Selective Service would refer massive numbers of non-registrants to the Justice Department. In that case, an appropriate selection system, probably based on "randomness," would be implemented. Random selection is a valid basis on which to justify prosecutions of non-registrants. *Steele,* 461 F.2d at 1152.

The court finds it hard to believe that the prosecutive arm of the Government, with access to Social Security records, could not locate any non-registrants other than those who were vocal in their opposition to draft registration. In fact, the Government concedes that if and when an active enforcement program is implemented, it has the ability to select men to prosecute based on randomness.

General Thomas K. Turnage, director of the Selective Service System, also remarked on the Government's ability to identify non-vocal non-registrants. In a statement prepared for presentation on July 28, 1982 to the Subcommittee on Courts, Civil Liberties and the Administration of Justice · of the House Judiciary Committee, General Turnage stated that "[i]n August, we start realizing the results of a more active compliance program with the ultimate goal of identification of all non-registrants. This program involves matching our Selective Service registrant files with files of the Social Security Administration."

Further, at the present time, when the active enforcement system has not yet been put in place, the court cannot accept the Government's disingenuous argument that it has prosecuted all known non-registrants. It strains credulity to believe that the investigative agencies of our Government, especially the Federal Bureau of Investigation, could not locate any non-vocal non-registrants.[6] The inference is strong that the Government could have located non-vocal non-registrants, but chose not to. For example, non-registrants could be located by using motor vehicle registration records in many states.

The defendant has also met the second prong of the *prima facie* test. In *Steele,* the court stated that "[a]n enforcement procedure that focuses upon the vocal offender is inherently suspect, since it is vulnerable to the charge that those chosen for prosecution are being punished for their expression of ideas, a constitutionally protected right." *Id.* at 1152. At the time of the September 30, 1982 hearing, all eleven men indicted under the Government's passive enforcement program were vocal opponents of draft registration.

---

4. Hereafter referred to as "Jensen Memo of July 9, 1982."

5. On December 1, 1981, 50 U.S.C.App. § 462 was amended to add subsection (e). It states:
 (e) The President may require the Secretary of Health and Human Services to furnish to the Director, from records available to the Secretary, the following information with respect to individuals who are members of any group of individuals required by a proclamation of the President under section 3 [section 453 of this Appendix] to present themselves for and submit to registration under such section: name, date of birth, social security account number, and address. Information furnished to the Director by the Secretary under this subsection shall be used only for the purpose of the enforcement of this Act.

6. A law student working for the defense phoned four states at random (Iowa, Michigan, Texas and Colorado) in an effort to see whether a list of eighteen-year-old persons was available. The law student found that such lists were easily obtainable. By comparing those lists with the Government's list of men who have actually registered, one should be able to identify non-vocal non-registrants.

Mr. Jensen's July 9, 1982 memorandum is again illuminating in this regard. He stated that the Justice Department's prosecutive policy is designed to insure that only persons who are most adamant in their refusal to register will be prosecuted. Under the passive enforcement program, non-registrants come to the attention of Selective Service by either reporting themselves or having others report them. Therefore, according to Mr. Jensen, the first prosecutions were liable to consist largely of persons who publicly refused to register. This would raise "thorny selective prosecution claims." [7]

Mr. Jensen underestimated the effect of the passive enforcement program. At the time of the hearing, and continuing until the present time, persons prosecuted for failing to register have consisted *solely,* not largely, of vocal non-registrants. Mr. Jensen's memorandum shows that the Government was aware of the consequences of its passive enforcement policy. The inference is manifest that the defendant has been singled out for prosecution because he exercised his first amendment right to free speech.

Additionally, it is the opinion of this court that the Government's normal prosecutorial sequence was not followed in this case. The Department of Justice is the agency charged with the responsibility for deciding who will be prosecuted. After receiving names of young men from the Selective Service System, the names would be transmitted to the appropriate United States Attorney. Ordinarily, it is the U.S. Attorney who would ultimately decide which non-registrants to prosecute.

It is clear to this court that agencies other than Selective Service and the Department of Justice have been involved in most of the decisions relating to prosecutions of non-registrants. A nexus has been established between the White House, through Edwin Meese III, Selective Service, and the Department of Justice. Mr. Meese is also a member of the Presidential Military Manpower Task Force ("Task Force"), an agency established to advise the President on military personnel matters. Numerous documents disclosed to the defendant by the Government indicate White House interest in the prosecution of non-registrants.

Both Mr. Meese, as an individual, and the Task Force were concerned with questions regarding "prosecutorial discretion." They also expressed concern with respect to the possible consequences of the policy the Government would choose to pursue. The involvement of Mr. Meese and the Task Force in prosecutorial policy decisions creates, at the very least, a strong inference of impropriety with regard to the Government's motive in seeking the prosecution of this defendant, and others similarly situated.

Once this court found that a *prima facie* case of selective prosecution had been established, the burden shifted to the Government to prove that its policy was not based on impermissible selective prosecution. The Government has failed to meet its burden.

On October 7, 1982, the court held a pretrial evidentiary hearing on the matter of selective prosecution. At the hearing, the Government called David J. Kline, Senior Legal Advisor in the General Litigation and Legal Advice Section in the Criminal Division of the United States Department of Justice. Mr. Kline's function is to render advice on and supervise the administration of certain federal statutes, among them 50 U.S.C.App. § 451 *et seq.*

Mr. Kline testified and documents were introduced through him at the hearing. In addition, the Government submitted affidavits of D. Lowell Jensen, Edward Frankle, former Associate Director, Selective Service System, Thomas K. Turnage and David J. Kline. Richard Romero, the Assistant U.S. Attorney prosecuting this case, also testified at the hearing. This constituted the Government's only attempt to rebut the

7. Jensen Memo of July 9, 1982.

*prima facie* finding.[8] After hearing Mr. Kline's testimony and examining the documents submitted by the Government, this court was convinced that the *prima facie* finding had not been rebutted. These documents were all introduced into evidence and disclosed to the defendant. There was no objection by the Government to having any of these documents examined by the court or the defendant.

In preparation for the evidentiary hearing, the defendant requested that the Government produce certain additional documents and witnesses. After numerous orders by this court to produce these documents and witnesses, the Government declined to do so. The Government has based its refusal on a claim of executive privilege.

Since the Government had the burden of rebutting the *prima facie* case of selective prosecution, its refusal to comply with this court's orders reflects a curious strategy. It also raises serious questions as to whether the Government has pursued this case in good faith.

■ There is an obvious problem of proof whenever a defendant raises selective prosecution claims. There is a presumption that a prosecution for violation of a criminal law is undertaken in good faith and in a non-discriminatory fashion. *Falk,* 479 F.2d at 620. However, when a defendant alleges intentional discrimination and presents facts sufficient to raise a reasonable doubt about the prosecutor's motive, the presumption is questioned. *Id.* at 620–621.

The circumstances of the *Falk* case, which led to a *prima facie* finding of selective prosecution, are particularly relevant in this case. First, Falk was actively involved in counseling others on legal methods to avoid military service in Vietnam. Similar circumstances, in which a vocal dissenter was exercising his first amendment rights, led the *Steele* court to find selective prosecution.

One indication that Falk was prosecuted for exercising a constitutionally protected right was the chain of officials that approved Falk's indictment. In addition to the Assistant U.S. Attorney who prosecuted Falk, the indictment was also approved by the Chief of the Criminal Division of the U.S. Attorney's Office, the First Assistant U.S. Attorney, the U.S. Attorney and the Department of Justice in Washington. The *Falk* court doubted that the usual procedure for prosecuting a draft case required such careful consideration from such a distinguished succession of officials. *Id.* at 622.

■ Wayte, like Falk, was actively involved in opposing draft registration. Wayte has written two letters to the President and given interviews to numerous media regarding his opposition to draft registration. Notwithstanding the assertions of the Government to the contrary, the list of officials involved in the prosecutive policy concerning non-registrants in the instant case is much more impressive than that in *Falk.* The list begins with Mr. Meese and other White House staff. It continues with the Task Force, which includes, among others, Mr. Meese, the Secretary of Defense, the Director of the Office of Management and Budget, the White House National Security Advisor, the Chairman of the Joint Chiefs of Staff and the Director of Selective Service. Of the officials mentioned, it is apparent to this court that Mr. Meese was most prominently involved in the entire process. Furthermore, the Justice Department in Washington, D.C. was also obviously involved in the process. Finally, and appropriately, in the case of this defendant, the U.S. Attorney's office for the Central District of California actually sought the indictment. As in *Falk,* the involvement of high Government officials in enforcement and prosecution decisions regarding non-registrants strongly suggests impermissible selective prosecution.

The *Falk* court was concerned with selective prosecution as it focused on one indi-

---

**8.** Edward Frankle was scheduled to testify for the Government at the evidentiary hearing. As a result of time constraints, Mr. Frankle was not called to testify on October 7, 1982. He ultimately did not testify because the evidentiary hearing was never resumed.

vidual. The court emphasized that the officials mentioned had approved Falk's indictment. The circumstances in this case are different from *Falk*. The constitutional infirmity is the Government's passive enforcement system itself. It is important to emphasize that no party in this case, nor this court, has ever suggested that the White House (through Mr. Meese or any staff) or the Task Force were involved in the decision to prosecute this particular defendant.

However, this court is troubled by the fact that the Government's passive enforcement program leads only to indictments of vocal non-registrants.[9] The Government was very conscious of the effect its passive enforcement policy would have on non-vocal non-registrants. In a statement that says much about the Government's attitude, one high Justice Department official stated, in a March 2, 1982 letter to Selective Service, that "the chances that a quiet non-registrant will be prosecuted is probably about the same as the chances that he will be struck by lightning."[10] Although Mr. Jensen signed this letter, the above quoted phrase was drafted by Mr. Kline.[11] This is the same individual who testified as the Government's major witness in its brief attempt to rebut the finding of a *prima facie* case.

The March 2, 1982 letter recognized the passive program had potentially serious first amendment problems that would lead to selective prosecution claims. The Government was well aware of the *Falk* decision. The letter stated:

> In order to avoid the risk of initial losses of non-registrant cases and the probable consequences of diminishing registrations, we believe that Selective Service must create a program of active identification which will be functioning, or well on the way toward functioning, at

the time of the first non-registrant prosecution.[12]

This, it has not done. Although the Government knew about the problems with the passive enforcement program, it chose to implement it. The Government must now accept the consequences of that choice.

There are other references to Government motives that cannot be reconciled with permissible prosecutorial discretion. The documents actually received into evidence in this case are replete with instances of discussions regarding the cost of the enforcement programs. Mr. Meese was particularly concerned with this topic. Obviously, the passive program was less expensive to implement. Although an active enforcement program has been considered by the Government for about a year and a half, it is not yet in operation. An effort by the Government to save money is not adequate justification for violating a person's first amendment rights.

Numerous references have also been made regarding the effect of the first prosecutions on other non-registrants. It was felt that the first wave of prosecutions would encourage other non-registrants to register. Since the passive program was designed to prosecute only those most adamant in their refusal to register, indicting only vocal non-registrants made tactical sense. This would presumably have the greatest impact and result in significant numbers of men registering for the draft. However, as *Steele* and *Falk* make clear, this policy violates the first amendment rights of the vocal non-registrants by selecting them, alone, for prosecution. The Government still retains a significant amount of prosecutorial discretion in deciding whom to prosecute. There is nothing in this decision to suggest otherwise. When this discretion is exercised, it must be done in a non-discriminatory manner.

---

**9.** Of the thirteen men who have been indicted, twelve have been self-reported and one has been reported by others.

**10.** Letter dated March 2, 1982 from D. Lowell Jensen, Assistant Attorney General, Criminal Division to Herbert C. Puscheck, Associate Di-

rector, Plans and Operations, Selective Service System. (Hereafter "Jensen Letter of March 2, 1982.")

**11.** R.T., October 7, 1982 at 53.

**12.** Jensen Letter of March 2, 1982.

While the Government refused to turn over certain documents to the defendant, it did make these documents available (in expurgated form, initially) to this court for an *in camera* inspection. After scrutinizing these documents, the court is reinforced in its belief that the nexus between the White House, through Mr. Meese, Selective Service, the Task Force and the Department of Justice, which existed at the time the *prima facie* finding was made, is still extant.

After carefully analyzing the arguments advanced by both parties, this court has determined that the *prima facie* finding has not been rebutted. Therefore, this court must grant defendant's motion to dismiss the indictment on the basis of the Government's policy of selective prosecution.

III. Selective Service Registration: Statutory Scheme

■ Defendant contends that the Military Selective Service Act ("Act"), 50 U.S. C.App. §§ 451 *et seq.,* standing alone, does not establish the basis for criminal liability for one who refuses to register. In pertinent part, 50 U.S.C.App. § 453 provides:

Except as otherwise provided in this title, it shall be the duty of every male citizen of the United States, ... who, on the day or days fixed for the first or any subsequent registration, is between the ages of eighteen and twenty-six, to present himself for and submit to registration at such time or times and place or places, and in such manner as *shall be determined by proclamation of the President* and by *rules* and *regulations* prescribed hereunder...

(emphasis added).

As indicated above, Congress expressly provided both that the executive branch should determine the appropriate time, place and manner for registration and that such decisions be expressed in rules, regulations and proclamations. In the case at bar, the indictment itself charges defendant with refusing to register "pursuant to the Military Selective Service Act, *rules* and *regulations* duly made pursuant thereto, and Presidential Proclamation 4771 of July 2, 1980" (emphasis added). Congress in-

tended that the Act merely be the foundation upon which to anchor a "statutory scheme."

Defendant cites three cases which address the role of regulations in the completion of a statutory scheme. Of the three cases, *United States v. Mersky,* 361 U.S. 431, 80 S.Ct. 459, 4 L.Ed.2d 423 (1960), is the most authoritative.

In *Mersky,* an information charged appellees with having violated 19 U.S.C. § 1304. *Id.* at 432, 80 S.Ct. at 460. The District Court dismissed the information on the ground that the acts by defendants had not violated § 1304 because the applicable regulation was not sufficiently clear to justify a criminal prosecution. *Id.* at 433, 80 S.Ct. at 461. The Government's appeal went directly to the Supreme Court. *Id.*

On the issue of the relationship between statutes and regulations, the Court stated:

An administrative regulation, of course, is not a statute. While in practical effect regulations may be called little laws, they are at most but offspring of statutes.... Here the statute is not complete by itself, since it merely declares the range of its operation and leaves to its progeny the means to be utilized in the effectuation of the command.... Once promulgated, these regulations called for by the statute itself, have the force of law, and violations thereof incur criminal prosecutions, just as if all the details had been incorporated into the congressional language. The result is that *neither the statute nor the regulations are complete without the other, and only together do they have any force.*

*Id.* at 437–38, 80 S.Ct. at 463–64 (emphasis added). Furthermore, the Court held that "when the statute and regulations are so inextricably intertwined," the statutory scheme in its entirety will be subject to judicial scrutiny. *Id.* at 438, 80 S.Ct. at 464.

Applying *Mersky* to the present case, defendant's argument that the court should view the applicable statute, regulations and proclamation as one statutory scheme is well founded.

Defendant has cited both *Schweiker v. Gray Panthers,* 453 U.S. 34, 101 S.Ct. 2633, 69 L.Ed.2d 460 (1981) and *Batterton v. Francis,* 432 U.S. 416, 97 S.Ct. 2399, 53 L.Ed.2d 448 (1977), as further support for his contention that regulations play an integral role in the overall statutory scheme. Both cases view administrative regulations as having "legislative effect" when it is clear that the regulations implement the congressional intent which gave rise to a particular statute. *Schweiker,* 453 U.S. at 43–44, 101 S.Ct. at 2640; *Batterton,* 432 U.S. at 425, 97 S.Ct. at 2405.

It is apparent that this court must read the Act in conjunction with both the regulations found at 32 C.F.R. Part 1615 and Presidential Proclamation 4771 in order to ascertain whether the entire "statutory scheme" involving draft registration is valid.

### A. The Registration Regulations at 32 C.F.R. Part 1615 and Executive Order 12044.

Defendant argues that the draft registration regulations were subject to the sixty-day notice and comment requirements of Executive Order 12044 rather than the normal thirty-day notice and comment period provided by the Act itself.[13]

Defendant contends that the initial decision of then Acting Director of the Selective Service, Robert Schuck, to comply with Executive Order 12044's sixty-day notice and comment period should be given the force and effect of law.[14] Furthermore, defendant argues that Acting Director Schuck's subsequent decision to allow thirty-two rather than sixty days for notice and comment, prior to the promulgation of the registration regulations, should lead the court to invalidate the provisions of the executive order and enforce the regulations.

The Government counters that the court has neither the jurisdictional authority to review the provisions of Executive Order 12044, nor the authority to enforce them. This court rejects the Government's first contention and accepts the second.

The Government appears to have confused the issue of the *enforcement* of executive orders with the more fundamental question of whether *judicial review* of executive orders is appropriate. The primary authority cited by the Government in support of its position, *Chrysler Corp. v. Brown,* 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979), refutes the very principle which the Government urges this court to accept.

In *Chrysler,* the Court examined Executive Orders 11246 and 11375, which charged the Secretary of Labor with the responsibility of ensuring that Government contrac-

---

**13.** In the relevant part, 50 U.S.C.App. § 463(b) provides that "no regulation issued under the [Military Selective Service] Act shall become effective until ... thirty days following the date on which such legislation has been published in the Federal Register."

**14.** On October 31, 1978, Acting Director Schuck issued a report which stated: "In accord with Executive Order 12044, at least 60 days will be allowed for comment on proposed regulations in the future." 43 Fed.Reg. 50981.

Executive Order 12044 provides, in pertinent part:

Section 1 *Policy.* Regulations shall be as simple and clear as possible....

To achieve these objectives, regulations shall be developed through a process which ensures:

....

(c) opportunity exists for early participation and comment by other federal agencies, State and local governments, ... and individual members of the public ....

Section 2 *Reform of the Process for Developing Significant Regulations.*

....

(c) *Opportunity for Public Participation.* Agencies shall give the public an early and meaningful opportunity to participate in the development of agency regulations.... Agencies shall give the public at least 60 days to comment on proposed significant regulations. In the few instances where agencies determine this is not possible, the regulation shall be accompanied by a brief statement of the reasons for a shorter time period.

....

Section 6 *Coverage.*

....

(b) This Order does not apply to: ... (2) regulations issued with respect to a military or foreign affairs function of the United States.

tors provide equal employment opportunities. *Id.* at 286, 99 S.Ct. at 1709. The Secretary of Labor promulgated regulations which required government contractors, such as Chrysler, to furnish reports and other information regarding their affirmative action programs and the composition of their work forces. *Id.*

The Department of Labor's Office of Federal Contract Compliance Programs ("OFCCP") promulgated regulations which required Chrysler to make certain documents available to the OFCCP's compliance agency. Additionally, the regulations provided public disclosure of information from OFCCP files. *Id.* at 284, 99 S.Ct. at 1708. It is the voluntary promulgation of the disclosure regulations, made pursuant to the executive orders, which the Government analogizes to Acting Director Schuck's voluntary embracement of the sixty-day notice and comment period.

■ The Government, at one point in its opposition papers, argues that *Chrysler* stands for the proposition that regulations and executive orders which do not have a statutory foundation are not reviewable by an Article III court.[15] However, a mere three sentences from that assertion is an acknowledgement by the Government of the fact that the Supreme Court did, indeed, review both the regulations in question and related executive orders. Clearly, an Article III court is not proscribed from reviewing the question of the enforceability of an executive order, irrespective of an attempt by the executive branch to make review an intra-branch function.[16]

The Government also relies heavily on *Manhattan-Bronx Postal Union v. Gronouski,* 350 F.2d 451 (D.C.Cir.1965), *cert. denied,* 382 U.S. 978, 86 S.Ct. 548, 15 L.Ed.2d 469 (1966), and its progeny as support for its position on judicial review of

Executive Order 12044. In *Gronouski,* the President issued Executive Order 10988 in an attempt to further his personal policy of enhancing the attractiveness of federal employment. *Id.* at 452.

*Gronouski,* like *Chrysler,* addressed the enforceability rather than the judicial reviewability of executive orders. The Government's assertion that *Gronouski* is irreconcilable with the concept of judicial review of executive orders must be rejected.

■ This court questions whether the Government is sincere in its position regarding judicial review of executive orders. The Government's position, if accepted by this court, would result in the vesting of exclusive jurisdiction over the question of the enforceability of executive orders within an Article I agency (the Office of Management and Budget). To accept such a position would cut against the very fabric of the Constitution which mandates that, in cases such as the one at bar, it is the province of an Article III tribunal, rather than the Office of Management and Budget, to review the question of the enforceability of the executive pronouncement. *Cf. Marbury v. Madison,* 5 U.S. 137, 176, 1 Cranch 137, 176, 2 L.Ed. 60 (1803) ("It is, emphatically, the province and duty of the judicial department, to say what the law is.").

■ Turning to the question of enforcement itself, this court agrees with the Government that the President alone has the authority to enforce the sixty-day notice and comment provision of Executive Order 12044. The court concurs with the Government's assertion that Executive Order 12044 is without a statutory genesis. Absent the requisite legislative foundation, the executive order is without the force and

---

**15.** *See* Government's Opposition to Defendant's Motion to Dismiss re Illegal Promulgation of Selective Service Regulations and Presidential Proclamation 4771, Memorandum of Points and Authorities, at 6–8.

**16.** "Summary and Analysis of Public Comments" for Executive Order 12044 which as-

serts that the enforcement of Executive Order 12044 rests with the Office of Management and Budget within the Executive Branch. Here again, the Government attempts to buttress its arguments against judicial *review* with a comment concerned with judicial *enforcement.*

effect of law. Therefore, its enforcement is subject to the discretion of the President. The following cases, when read together, stand for the proposition that executive orders without a legislative genesis have no legal force and effect.

In *Gronouski,* the court addressed the question of whether the Postmaster General had violated Executive Order 10988. The court stated that the executive order in question had merely established a "broad policy," and that it was the responsibility of the Postmaster General to decide how to implement that policy. In addition, the court stated that the executive order

> had no specific foundation in Congressional action.... It represented simply one President's effort to move in the direction of what had been advised by his experts would be an improvement in the efficiency of federal government.... [The] action [by the Postmaster General] does not seem to us to conflict with the Executive Order. But, even if it did, it does not follow that appellants have a right of such a nature as to warrant intervention by an equity court.

*Id.* at 456–57.

Next, the Seventh Circuit addressed the question of whether executive orders have the force and effect of law. In *Stevens v. Carey,* 483 F.2d 188 (7th Cir.1973), a federal civil service employee brought an action against a federally recognized union that expelled her from membership. *Id.* at 189.

The court addressed the issue of whether "Executive Orders, like congressional enactments, have the force and effect of 'laws ... of the United States.'" *Id.* at 190. The court stated that in those cases in which executive orders have been granted the force and effect of law, they had been issued "pursuant to statutory authority." *Id.* Finding an absence of the requisite statutory authority in *Carey,* the court held that the executive order in question was without the force and effect of law. *Id.* at 190–91.

Other circuits have stated similar views. In *Local 1498, American Federation of Government Employees v. American Feder-* *ation of Government Employees, AFL–CIO,* 522 F.2d 486 (3d Cir.1975), the district court denied plaintiffs leave to sue under the Labor-Management Reporting Disclosure Act of 1959. *Id.* at 487–88. Plaintiffs appealed, and the court of appeals affirmed holding, *inter alia,* that the executive order was not a "law of the United States." *Id.* at 490–91.

The Third Circuit found:

> [The executive order] was not issued under the statutory authority providing for presidential implementation or effectuation of statutory provisions.... Hence, while Executive Order No. 11491 regulates and implements federal government personnel policies, *it does so solely as a product of executive authority and not as a consequence of congressional law making.* Accordingly, this Executive Order ... cannot attain the status as [sic] a "law of the United States."

*Id.* at 491 (emphasis added).

In *Independent Meat Packers Ass'n v. Butz,* 526 F.2d 228 (8th Cir.), *cert. denied,* 424 U.S. 966, 96 S.Ct. 1461, 47 L.Ed.2d 733 (1975), plaintiffs sought declaratory and injunctive relief against the implementation of federal Department of Agriculture regulations. *Id.* at 231. The district court granted a permanent injunction and defendants appealed. *Id.* The court of appeals dissolved the injunction holding, *inter alia,* that the executive order involved in the case did not have the force and effect of law. *Id.* at 236.

The court reiterated the general rule that "Presidential proclamations and orders have the force and effect of laws when issued pursuant to a statutory mandate or delegation of authority from Congress." *Id.* at 234 (citations omitted). After an historical analysis of the intent of the framers of the United States Constitution, the court found that the President may not "act as a lawmaker in the absence of a delegation of authority or a mandate from Congress." *Id.* at 235. The court went on to hold that in enacting Executive Order 11821, the President had not been responding to a

congressional delegation of lawmaking authority. Therefore, Executive Order 11821 was not given the force and effect of law. *Id.*

The most recent case on point comes from the Fourth Circuit. In *Liberty Mutual Insurance Company v. Friedman,* 639 F.2d 164 (4th Cir. 1981), certain insurance companies challenged the district court's conclusion that the companies were government subcontractors and, thus, subject to certain requirements of Executive Order 11246. *Id.* at 165. After a lengthy analysis of possible statutory bases for Executive Order 11246, the court of appeals reversed, concluding that the Order was not authorized by Congress. *Id.* at 172. The court held that in the absence of congressional authority, the executive order was without the force and effect of law. *Id.*

Furthermore, in a footnote, the court stated that the possibility that authorization for the executive order might be found independently of a statutory source in the "inherent powers" of the President "is completely foreclosed by *Youngstown Sheet and Tube Company v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952)...." *Liberty Mutual,* 639 F.2d at 172 n. 13, citing *Youngstown,* 343 U.S. at 587, 72 S.Ct. at 866. In *Youngstown,* the Court held that the "inherent powers of the President," under his authority as Commander-in-Chief, did not support his executive order directing seizure of the steel mills during the Korean conflict. The Court found the President's action to be legislative in nature, and, in the absence of any delegation of lawmaking authority from Congress, none could be inferred. *Id.* at 172.

 Applying the holdings of the above-cited cases to the present case, this court must first find that Executive Order 12044 was issued pursuant to statutory authority before this court may enforce the sixty-day notice and comment provision against the Selective Service. On the face of the executive order there is no mention of any underlying statutory basis. This court is unaware of *any* statute which serves as a foundation for the executive order.

The Director of Selective Service had no more than an obligation to issue regulations after a thirty-day notice and comment period. His decision to allow thirty-two days, rather than sixty days, is not a proper matter for judicial concern. Absent a clear and definite legislative genesis upon which to anchor the executive order in question, the decision to enforce the order's provisions rests with the Chief Executive rather than with the judicial branch.

Therefore, defendant's motion to dismiss the indictment due to the illegal promulgation of the registration regulations must be denied.

B. Presidential Proclamation 4771

 Defendant contends that the Proclamation announced, on its face, that it was effective immediately upon publication and that the initial registration period began a mere three weeks from the publication date. Defendant argues that the Proclamation was subject to the thirty-day notice and comment requirement prescribed by the Act, 50 U.S.C.App. § 463(b). In enacting § 463(b), Congress provided that "no regulation issued under the Act shall become effective until thirty days following the date ... such regulation has been published in the Federal Register."

Interestingly, the Government does not dispute the fact that if the Proclamation had been a regulation, it clearly would have been subject to the thirty-day notice and comment requirement. However, the Government argues that Congress did not intend to include presidential proclamations within the requirements of § 463(b) because the word "proclamation" did not appear on the face of the statute. Defendant argues that where Congress envisions a statutory scheme, i.e., a statute to be accompanied by rules, regulations and proclamations, it is reasonable to infer that Congress intended to subject both regulations and proclamations to the same notice and comment requirements.

During the debate in Congress over the enactment of § 463(b), Senator McIntyre, who co-sponsored the measure, stated that:

Presently the Selective Service System issues the bulk of its regulations in the form of executive orders. The remainder are issued by the Director. Although these regulations are published in the Federal Register, they are effective on the date they are issued. *This poses a problem because it gives no lead time for persons who are affected by the regulations to become aware of them .... The Amendment under consideration would correct the possibility of this kind of occurrence.*

117 Cong.Rec. 20487 (June 17, 1971) (emphasis added).

Numerous courts have held that presidential proclamations, executive orders and administrative regulations all have the force and effect of law when accompanied by the proper statutory foundation.[17] Each of those courts has seen fit to use the terms "rules," "regulations," "orders," and "proclamations" interchangeably when the particular facts of cases before the courts called for the court to do so.

One example is provided by *Hampton and Co. v. United States,* 276 U.S. 394, 406, 48 S.Ct. 348, 351, 72 L.Ed. 624 (1928), in which the court characterized a presidential proclamation as a lawful exercise of the President's discretion to make "public regulations" interpreting a statute. Furthermore, two district courts have ruled on the interpretation of the term "regulation" in 50 U.S.C.App. § 463(b).

In *Piercy v. Tarr,* 343 F.Supp. 1120 (N.D. Cal.1972), plaintiffs were selective service registrants who were classified as conscientious objectors by the Selective Service System. *Id.* at 1121. Plaintiffs argued that the promulgation by the Selective Service of certain informal "directives" was contrary to the mandatory pre-publication requirements of § 13(b) of the Act and the implementing executive order. *Id.* The district court found for plaintiffs and issued a permanent injunction which prevented

the defendant from enforcing the civilian work order in dispute. *Id.* at 1129.

On the issue of whether "directives" from the Director of Selective Service are subject to the notice and comment requirements for "regulations," the court held:

[T]he directives here involved, which purported to alter significantly the rules and regulations ..., are required to be published in conformity with [50 U.S.C.App. § 463(b)].

. . . .

... [I]t matters little whether [the] directive is a "rule", an "order", or a set of "instructions", or only a sui generis "directive".... The court cannot hold that the publication requirements of the Act hinge on the particular format the Selective Service System chooses to issue authoritative instructions couched in mandatory terms.

*Id.* at 1128. The court refused to allow defendants the opportunity to "rely on the narrow reference to 'regulations' in ... 50 U.S.C.App. § 463(b)" as a basis for avoiding its mandate. *Id.* See also Gardiner v. Tarr, 341 F.Supp. 422 (D.D.C.1972) (declarations of policy with force and effect of law are subject to the notice and comment requirements of § 463(b) even though not "rules" or "regulations").

Likewise, in the case at bar, this court rejects the Government's contention that because the Proclamation is not a "regulation," it is not subject to the notice and comment requirements of § 463(b). This court will refrain from engaging in the semantic gymnastics that the Government offers. Simple logic dictates that, in light of the facts of this case, "proclamation" should be read as "regulation" for the purposes of the notice and comment requirement of § 463(b).

On the very face of the Proclamation, President Carter declares that he is issuing the proclamation "by the authority vested in me by the Military Selective Service

---

**17.** In fact, almost without exception, each of the courts in the above-cited cases concerning the legal effect of Executive Order 12044 has mentioned in dictum its support for such a proposition. *Cf. Liberty Mutual,* 639 F.2d at 167; *Independent Meat Packers,* 526 F.2d at 234; *Local 1498,* 522 F.2d at 491; *Carey,* 483 F.2d at 190–91; *Gronouski,* 350 F.2d at 456.

Act." 45 Fed.Reg. 45247 (July 2, 1980). Along with the congressional grant of authority cited by President Carter came the responsibility to guarantee a thirty-day period prior to the final publication of the proclamation for notice and comment. Absent an effective waiver by the President of the notice and comment requirement, the noncompliance with § 463(b)'s prescription provides a basis for invalidating the provisions of the Proclamation.

█ The Government argues that if the notice and comment provision is applicable to presidential proclamations, it was waived by President Carter. Section 463(b) provides, in part:

> The requirements of this subsection may be waived by the President in the case of any regulation if he (1) determines that compliance with such regulations would materially impair the national defense, *and* (2) gives public notice to that effect at the time such regulation is issued.

(Emphasis added).

The Government argues that President Carter's statements regarding Afghanistan and the Soviet Union were made in an effort to provide public notice of the fact that he was waiving the thirty-day notice and comment requirement.[18] This court does not agree with the Government's contention that statements made by President Carter, at the time he issued Presidential Proclamation 4771, amounted to a clearly articulated and legally sufficient waiver of the notice and comment requirement.

█ Finally, the Government advances the meritless argument that, even assuming President Carter should have complied with § 463(b), any error resulting from his failure to comply was made in "good faith," and, hence, it should be disregarded. The Government does not address the fact that the "harmless error" argument appears particularly ill-conceived in the context of a criminal prosecution involving one who allegedly defied the proclamation at issue. Irrespective of whether the error was made in good faith, it could hardly be characterized as "harmless error." This court cannot accept the Government's final argument.

The court recognizes the widespread effect that a decision granting defendant's motion to dismiss due to the illegal promulgation of the Proclamation will have on this nation's selective service registration program. However, justice compels the court to grant defendant's motion. The proclamation in question was neither expressly nor impliedly exempted from the thirty-day notice and comment requirement of § 463(b). The court cannot close its eyes to the fact that the proclamation became effective a mere twenty-one days after it was published. What might appear a minor breach of the mandate of § 463(b) takes on far greater significance in the context of criminal liability emanating from a defective component of the draft registration's statutory scheme.

## CONCLUSION

For the reasons stated above, defendant's motion to dismiss is granted and the indictment shall be dismissed. The dismissal is with prejudice, and is based on a finding of discriminatory prosecution. As a separate and independent basis for dismissal of the indictment, this court has found the time, place and manner requirements of Presidential Proclamation 4771 are invalid.

---

18. Upon signing Presidential Proclamation 4771, President Carter stated that he was "deeply concerned about the unwarranted and vicious invasion of Afghanistan by the Soviet Union and occupation by them of this innocent and defenseless country ...." 16 *Weekly Compilation of Presidential Documents* 1274 (1980).